J-S15011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DECARLOS KAVAUN WARREN | : | No. 783 WDA 2024 |

Appeal from the Order Entered June 5, 2024
In the Court of Common Pleas of Beaver County Criminal Division at
No(s): CP-04-CR-0000637-2023

BEFORE: OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY OLSON, J.: **FILED: August 1, 2025**

The Commonwealth of Pennsylvania appeals from the trial court's June 5, 2024 order, which granted DeCarlos Kavaun Warren ("Defendant") a new trial. We affirm.

The trial court ably summarized the underlying facts and procedural posture of this case:

> On July 16, 2021, Captain James Siget of the Beaver Falls Police Department and co-affiant Detective Michael Kryder filed a criminal complaint[,] . . . following a shooting incident that occurred on July 12, 2021. The criminal complaint charged Defendant with criminal homicide of Dwayne Wells under 18 Pa.C.S.A. § 2501(a), three counts of attempt to commit criminal homicide under 18 Pa.C.S.A. § 901(a) and § 2501(a), three counts of aggravated assault under 18 Pa.C.S.A. § 2702(a)(1), three counts of aggravated assault with a deadly weapon under 18 Pa.C.S.A. § 2702(a)(4), three counts of recklessly endangering another person ("REAP")

---

[*] Retired Senior Judge assigned to the Superior Court.

under 18 Pa.C.S.A. § 2705, and one count of persons not to possess a firearm under 18 Pa.C.S.A. § 6105(a)(1).  On the same date, Magisterial District Judge Joseph Schafer issued a warrant for Defendant's arrest.  The warrant for Defendant's arrest was placed into NCIC by law enforcement.

Based on their investigation, law enforcement concluded that Defendant was no longer located in Beaver County, and that he had fled to the state of Michigan.  . . .

[On] March 16, 2023, Defendant was arrested by Michigan State Police in Jackson County, Michigan.  On March 20, 2023, Defendant waived his right to an extradition hearing. On March 23, Beaver County sheriffs and Detective Michael Kryder transported Defendant back to Beaver County, Pennsylvania. During transport back to Beaver County, Detective Kryder orally provided Defendant with **Miranda**[1] warnings.

On March 23, 2023, after being transported to Beaver County from Michigan, Detective Kryder and Captain Siget conducted a video-taped custodial interview of Defendant prior to his arraignment.  . . . After a few minutes of talking, Defendant indicated that he did not want to talk further with the police until after he talked to his attorney.  At that point, Detective Kryder and Captain Siget ended the interview.

. . .

The Commonwealth filed an Information on May 31, 2023, charging Defendant with the same offenses charged in the criminal complaint: one count of criminal homicide (murder), three counts of criminal attempt to commit criminal homicide, three counts of aggravated assault, three counts of aggravated assault with a deadly weapon, three counts of REAP, and one count of persons not to possess a firearm.

. . .

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[During Defendant's jury trial, the following evidence was presented:]

In July 2021, Alante Lindsey, from Ypsilanti, Michigan, was in Beaver County, Pennsylvania, visiting his friend Monte "Lucky" Warren, who had been living in the Beaver County area for years. On July 12, [2021], Lindsey went to Harmony Dwellings, a public housing complex maintained by the Beaver County Housing Authority, to meet some friends at Tiara Fair's apartment. When Lindsey arrived at Fair's apartment, there were about four to five people there. At one point, a man with a hoodie, later identified as Dwayne "Wild Wayne" Wells, entered the apartment without knocking while Fair was not present at the apartment. The man, who was unknown to Lindsey and the others in the apartment, went straight to the kitchen after entering the apartment. The man returned to the living room with a bottle of alcohol, took a shot of liquor, and then looked at every person in the apartment straight in the eyes individually. The man stated that the apartment was his sister's and that he had to use the bathroom. However, the man, *i.e.*, Wells, left the apartment without ever using the bathroom. Wells crossed the street and took a phone call. After Wells left, Lindsey called Defendant and his brother Monte and told them that Wells's behavior was making him paranoid and worried that something bad was going on.

On July 12, 2021, Defendant was in Beaver Falls, Pennsylvania visiting his brother, Monte Warren. In the evening hours of that day, Defendant left his hotel in a white GMC SUV and drove to Harmony Dwellings. Defendant originally planned on dropping a friend off at Harmony Dwellings and then going to the mall, but once he arrived at Harmony Dwellings, Defendant noticed Monte there, so he decided to stay at Harmony Dwellings. Defendant stayed in his car, at first to finish a phone call. While he was still in his car, Defendant observed an unknown male enter the apartment where his friends were. After he finished his phone call, Defendant got out of his car and walked toward the apartment. Defendant entered the apartment through the backdoor as Wells left through the front door. Alante Lindsey informed Defendant that Wells had entered the apartment and how he behaved in a threatening manner toward the people in the apartment. Defendant saw that

- 3 -

Wells's intrusion had made everyone inside the apartment nervous and agitated because they could not understand what Wells was doing in the apartment. At that point, Tiara Fair reentered the apartment and told the group that the man who had entered the apartment was Dwayne Wells. Fair informed the others that Wells was cussing her out and telling her to "get them niggas out of here." The group stayed inside the apartment for about seven minutes in total after Defendant arrived, trying to decide how to proceed. Defendant and his brother Monte Warren made the decision to try to leave Harmony Dwellings.

Having decided to get out of the area, the group inside Fair's apartment exited the apartment and made their way towards the black Jeep. When they walked outside of the apartment, they heard an unidentified male, later identified as Tristen Nesmith, shouting belligerently at Defendant's group. As they were leaving, they ran into Jaezyn "Philly" Baker in front of Monte Warren's black Jeep. Baker, who was friends with both Dwayne Wells and Monte Warren, had left a friend's birthday party to come to Harmony Dwellings because Wells had asked him to go down to Harmony Dwellings with him. Wells had told Baker "you better tell these niggas who the fuck I am." Baker testified that when he arrived he spoke with Monte Warren and his brother, Defendant.

As Defendant and his brother were talking to Baker, Dwayne Wells' group of about eight or nine individuals began converging on their position and stationing themselves at the exit-road out of Harmony Dwellings. Baker testified that Tristen Nesmith, a member of Wells's group, was drinking and getting rowdy, so Baker tried to get him to calm down and leave the scene. Wells was also getting rowdy at that point. According to Baker, Wells was "gassed up." Defendant and his group believed that Wells and his associates would attempt to prevent them from leaving the housing complex, and they were afraid that if they attempted to drive away from the area then Wells's group would shoot at their vehicles. Lindsey testified that he thought that Wells and his friends would kill Defendant, Monte Warren, Lindsey, and their friends if they tried to leave. Defendant had initially told his friends to get in their cars to leave, but as Defendant grew fearful that they would get shot at if they attempted to drive away, he and his friends got back out of their cars.

- 4 -

While Defendant, Monte Warren, and their friends were still standing in front of the black Jeep discussing what to do, Daron Choice and his brother Dwelley Choice began approaching, and one of the brothers stood in front of the black Jeep. Defendant had never met the Choice brothers at this point, and did not know who they were. Defendant then heard Tristen Nesmith yell to Philly "fuck them niggas Philly!" Nesmith continued yelling profanities at Defendant and his group. At trial, Nesmith testified that he and Wells planned to "run down" Defendant and his group. Nesmith further testified that to "run down" means to confront somebody or to check somebody. Nesmith explained that the term can mean anything from engaging in a fist-fight to shooting people with a firearm.

As Defendant, Monte Warren, and their group were still trying to leave, Dwayne Wells got back out of Lashonna Haves-Owens's car and began aggressively approaching the group in front of the black Jeep, waving his arms around and clapping his hands. At the same time, there were more cars driving up to the exit of Harmony Dwellings, and more people approaching Harmony Dwellings on foot. Baker testified at trial that although no one had called for reinforcements, it looked like someone had. Baker further testified that the new cars and people put the Warrens in a defensive position, saying specifically that he would have felt threatened if he was not from the area.

As he approached, Wells was shouting at Defendant and his group, saying things like "fuck them niggas, better tell them who I am," "this shit ends tonight," and "we run these projects." As he got closer to the group, Wells put his hand in his hoodie pocket and moved it around inside the pocket. Once he got to the group, Wells shouted "you niggas won't make it out of here" right in Defendant's face. Alante Lindsey testified at trial that he saw the back of a gun poking out of Wells's pocket as he approached the group. At this point, according to Defendant's testimony, Wells tried to pull something out of his hoodie pocket, but it got stuck inside the pocket as he tried to pull it out. Defendant, believing that Wells was attempting to pull a firearm out of his pocket, pulled his own firearm out and shot and hit Wells. Wells died at the scene from the gunshot wounds he suffered to his

trunk. . . . Immediately after Defendant shot Wells, the group in front of the black Jeep scattered, with people running away from the gunshots.

After shooting Wells, Defendant continued firing his gun at the remaining members of Wells's group. Defendant shot at Daron Choice, who was still in close proximity to Defendant's position but was in the process of running away from the gunshots. Daron Choice was hit in the back, abdomen, and right elbow. . . . Once Dwelley Choice, who was also running away from the gunshots, saw that his brother had been shot and had collapsed on the ground in the middle of the road leading out of Harmony Dwellings, he pulled his own firearm and began firing at Defendant. When Dwelley Choice began firing, Defendant retreated behind the black Jeep and the other cars on that side of the road for cover, and then Defendant and Dwelley Choice began exchanging gunfire. During this gunfight, Dwelley Choice shot Monte Warren, who was unarmed. Monte Warren collapsed near the black Jeep after being shot. Defendant was also shot during the gunfight. While he was covering behind the white GMC SUV, Defendant was shot in the foot. Samples of the blood from the gunshot wound to Defendant's foot were later recovered at the crime scene by law enforcement. Defendant also shot and hit Dwelley Choice in his right flank, his left abdomen, his back, and his right leg. . . .

After exchanging gunfire with Dwelley Choice for about thirty seconds, Defendant noticed that the slide of Dwelley Choice's gun was locked back and that he was out of ammunition. Seeing this, Defendant exited from behind the cover of the white GMC and began moving back toward the black Jeep and his wounded brother. Defendant shouted for Monte Warren to get up, and then shouted at Dwelley Choice to "get back," while aiming his firearm at him. . . . Defendant and Monte Warren then got into the black Jeep and drove away from the scene. Notably, as Defendant was driving out of Harmony Dwellings, he drove around Daron Choice, who was standing in the middle of the road. After they had driven away from Harmony Dwellings, Monte Warren threw the gun that Defendant had used at the scene out of the car and into some bushes.

Michael Jones, a confidential police informant who had worked with Captain Siget previously, testified at trial that on July 12, 2021, he was on 10th Avenue and 13th Street in Beaver Falls with Akhil Solomon. At that time, Jones noticed something get thrown out of the passenger's side of a passing car. Once the car was gone, Solomon used a plastic bag to pick the object up. Jones saw that the object was a gun. Jones then watched as Solomon took the bag with the gun in it across the nearby train-tracks toward the Beaver River. When Solomon returned to Jones he no longer had the bag or the gun. The firearm was later recovered from the Beaver River by law enforcement. . . .

After driving away from Harmony Dwellings, Defendant first stopped briefly at a nearby fire department to see if he could get help for his brother, who was dying of the gunshot wound inflicted by Dwelley Choice. Defendant quickly drove away from the fire department and called his girlfriend, Taylor Pavick. Pavick, who was out with her child and her cousin Myah Hunter at the time, answered Defendant's call, and Defendant told her that his brother was dying and to meet him at her home at 816 Whipple Court, Beaver Falls. When Pavick returned to her house, Defendant and his brother were already there. Monte Warren was collapsed in the passenger's seat of the black Jeep covered in blood. Pavick immediately got in the black Jeep and drove Monte Warren to Heritage Valley Hospital Beaver. Monte Warren later died at Heritage Valley Hospital.

Back at 816 Whipple Court, Defendant entered the house through the backdoor, leaving stains of blood around the back door. . . . According to Defendant, he dropped his cell phone on the concrete stairs leading to the backdoor of the house. Defendant testified that his phone was not operable past this point. Once inside, Defendant asked Pavick's cousin Myah Hunter for a towel for his shot foot to clean up the wound. Defendant also got hot water and bleach to clean up the blood he had tracked into Pavick's kitchen. Defendant then asked Hunter to take the trash out.

Defendant then left 816 Whipple Court and returned to his hotel in Chippewa. Later, Defendant got a ride back to his home in Michigan from a mutual friend. Defendant stayed at his home at 1022 Nash Avenue in Ypsilanti, Michigan for

about two to three months while his foot healed, then he went to Jackson, Michigan, where he was eventually apprehended by law enforcement.

At trial, Defendant testified that he shot Dwayne Wells in self-defense. He testified that Wells's aggressive behavior made him afraid for his own life and the lives of his friends, and his brother. He testified that he was not very familiar with Harmony Dwellings or the surrounding area. Defendant stated that he knew that there was a fence surrounding the housing complex, and that the only person he knew who lived in Harmony Dwellings was Tiara Fair. Because of his unfamiliarity with the area, Defendant did not know any way to get out of Harmony Dwellings other than the main road leading into the housing complex. Defendant testified that after Wells approached, everything happened so fast that he did not have enough time to retreat given his unfamiliarity with the area and Wells's aggressive behavior.

Cheyenne Ambrose, who was familiar with Dwayne Wells through the mother of Wells's child, testified at trial on behalf of the Defense. Ambrose testified that Wells was planning to rob Defendant and his friends on the day of the shooting. Ambrose stated that Wells told her that he had a plan to rob Taylor Pavick's boyfriend, *i.e.*, Defendant.

A few days after the shooting, Tristen Nesmith contacted Taylor Pavick through Facebook messenger using his girlfriend's Facebook account. Nesmith told Pavick that he wasn't sure if the shooting was his fault or not, and that he was sorry. Several months later, on October 23, 2021, Nesmith went to Pavick's home at 816 Whipple Court in an apparent attempt to intimidate or threaten her about her involvement with this case. A surveillance video showing the front porch and door of 816 Whipple Court depicting the incident was admitted into evidence at trial. The video shows a car pull up and park near 816 Whipple Court driven by Seniquoa Barnes, Tristen Nesmith's girlfriend. Nesmith exited the vehicle and walked toward the front door of 816 Whipple Court. Pavick testified that she had not invited Nesmith to her home, and that at that time she was afraid of Nesmith because he had been going around town and talking about her involvement with the case. In the video, Barnes, still in the car, shouted at Nesmith "you don't have shit,"

- 8 -

which Pavick took to mean that Nesmith was unarmed. Nesmith responded to Barnes saying "what does that have to do with my hands," a statement which Pavick took as a threat of physical violence toward her. Pavick was afraid that Nesmith would physically attack her. After knocking on the door a couple times and trying to get Pavick's attention, Nesmith eventually went back to Barnes's car and left. Pavick called the Beaver Falls Police Department about this incident and may have spoken with Captain Siget, but the police did not follow up regarding this incident. Pavick called the Beaver Falls Police Department numerous times between the shooting and trial. On July 22, 2022, Pavick called the police to inform them about some concerning things she had been hearing about the case, including the potential location of Nesmith's firearm. Pavick testified that Captain Siget told her that her claims were hearsay and that the police would not do any investigation about her claims.

The most crucial piece of the Commonwealth's evidence presented at trial was a surveillance video of the Harmony Dwellings parking lot obtained from security cameras maintained by Beaver County Housing Authority which shows that Defendant was confronted by a group of several seemingly-hostile individuals. The surveillance video shows a group of people congregating in front of a black Jeep SUV, one of the people in that group being later identified as Defendant. Several individuals are seen walking into Harmony Dwellings toward the group of people. The video then shows that an individual later identified as Dwayne Wells got out of a red car and rapidly approach the group standing in front of the black Jeep. The camera's view of Wells becomes obstructed by other people once he reaches the group in front of the Jeep so the video does not show whether Wells was armed, but the video does show Defendant extend his arm and fire a handgun at Wells multiple times. The video then shows that Defendant continued to fire his gun as Wells and the rest of the group began running away from the gunshots. The video shows that after Daron Choice was hit and collapsed, Dwelley Choice turned around, pulled out a firearm, and began returning fire toward Defendant and his brother Monte Warren. Defendant retreats behind the parked cars for cover, and then he and Dwelley Choice exchange gunfire for about half a minute. During this segment of the video, Defendant can be seen limping as he makes his way

- 9 -

back to the black Jeep. Finally, Defendant leaves the scene in the black Jeep accompanied by Monte Warren.

. . .

At trial in this case, the Commonwealth made several references to Defendant's post-arrest silence. First, during its case-in-chief, the Commonwealth recalled Detective Michael Kryder, one of the two detective-affiants of this case, to the stand. Detective Kryder, who had already testified previously during trial, was recalled to lay the foundation for a video-taped interview that he and Detective Captain Siget had conducted of the Defendant after his arrest and return to Beaver County. During cross-examination, defense counsel brought out the fact that there was no video of when Detective Kryder provided Defendant with his *Miranda* warnings, and he emphasized several statements Defendant made to Detectives Kryder and Siget in the video. On redirect examination, Assistant District Attorney Battin asked Detective Kryder "Did the, when you did this interview for Mr. Warren or at any time did Mr. Warren ever say he shot in self defense?" N.T., Trial Vol. V, 2/7/2024, at 87. Detective Kryder answered "No." *Id.* Immediately following this question to Detective Kryder, the Commonwealth called the other affiant, Detective Captain James Siget, to the stand. On direct examination, A.D.A. Battin asked Captain Siget "Is there any information given to you [at the interview] that pertains to self defense?" *Id.* at 180. Captain Siget replied that "There was not." *Id.* Finally, during closing argument, A.D.A. Battin made the following reference to the earlier testimony: ["Defendant] had the opportunity to hear all the evidence and then tell you his side of the story, a story that he would not give Kryder or Siget.["] N.T., Trial Vol. VIII, 2/12/2024, at 82. After A.D.A. Battin concluded his closing argument, defense counsel objected to the comments regarding Defendant's post-arrest, post-*Miranda* silence. *Id.* at 114. Defense counsel claimed that A.D.A. Battin's comments on Defendant's post-arrest silence were "in direct contravention to the Pennsylvania Constitution Article I, Section 9 that even by mentioning it is a serious and grave issue." *Id.* Th[e trial c]ourt commented that it had provided both counsel with [the Pennsylvania Supreme Court's opinion in *Commonwealth v. Rivera*, 296 A.3d 1141 (Pa. 2023)] and noted that under that case a reference to a defendant's

- 10 -

post-arrest silence is constitutionally off-limits. ***Id.*** at 114, 123-24.

Review of the videotape of the custodial interrogation of Defendant shows that Defendant invoked his right to remain silent and his right to counsel during the interview. . . . Following his arrest and transport back to Beaver County, Defendant was taken to Beaver County Courthouse where he was interviewed by Detective Kryder and Captain Siget. After Captain Siget confirmed that Detective Kryder had already provided Defendant with his ***Miranda*** warnings, Detective Kryder asked Defendant if he had any questions. Defendant indicated that he did, and asked "Why am I the only one in jail? My brother died too." Detective Kryder told Defendant that he was in jail "because you fired first." Defendant repeated the statement back to Detective Kryder in a questioning tone, stating "I fired first?" Detective Kryder then asked "Am I wrong?" Defendant replied "I don't know, you tell me. Is it wrong or is it right?" After asking several questions about the surveillance video that depicts the shooting, Defendant again asked why no one was in jail for the death of his brother, Monte Warren. Detective Kryder explained that the decision of whether to charge someone with the death of Defendant's brother was made by the District Attorney's Office. Defendant replied "Don't make sense to me; I ain't start shit." Detective Kryder asked Defendant to tell him and Captain Siget what happened at the time of the shooting, to which Defendant responded "you'll know what happened soon when court starts. I got a lawyer, he waiting . . . he probably knows I'm already here." After some discussion about who Defendant's lawyer was, Detective Kryder again asked if Defendant wanted to tell his side of the story. Defendant stated "I'll wait and see what they tell me to say," referring to his attorney. Captain Siget then commented that it was fine if Defendant didn't want to tell his side of the story and that it was up to Defendant to decide whether to tell his side of the story to them. While not all of what Defendant says at this point in the interview is distinguishable from the audio of the videotape, Defendant at one point responded by stating "I ain't got a side." Defendant also said that if the police had the full video of the shooting then that would be good for him. Detective Kryder asked "what led you up to start shooting?" Defendant responded "listen, when I talk to my lawyer, he come in, we

can try again." Immediately after Defendant made that statement Detective Kryder and Captain Siget concluded the interview, as it had become clear that Defendant was not going to make a statement and had exercised his right to counsel and his right to remain silent.

. . .

On February 14, 2024, the jury found Defendant not guilty of first-degree murder, third-degree murder, and voluntary manslaughter for the death of Dwayne Wells. In addition, the jury returned a verdict of not guilty for the attempted murders of Tristen Nesmith, Daron Choice, and Dwelley Choice. The jury found Defendant not guilty of the aggravated assault of Tristen Nesmith under § 2702(a)(1) and § 2702(a)(4), but found him guilty of the aggravated assaults of Daron Choice and Dwelley Choice under both § 2702(a)(1) and § 2702(a)(4). Lastly, the jury found Defendant guilty of recklessly endangering Daron Choice, Dwelley Choice, and Tristen Nesmith.

Trial Court Opinion, 8/16/24, at 7-26 (footnotes and some citations omitted).

On April 2, 2024, the trial court sentenced Defendant to serve an aggregate term of five to ten years in prison for his convictions. *See* N.T. Sentencing, 4/2/24, at 50.

Defendant filed a timely post-sentence motion and claimed that the Commonwealth's references to his post-arrest silence entitled him to a new trial. The trial court granted Defendant a new trial based upon this claim and the Commonwealth filed a timely notice of appeal.[2] The Commonwealth raises three claims on appeal:

---

[2] The Commonwealth appeals pursuant to Pennsylvania Rules of Appellate Procedure 311(a)(6) (providing that the Commonwealth may appeal from "an order in a criminal proceeding awarding a new trial where . . . the
*(Footnote Continued Next Page)*

1. Did the trial court abuse its discretion when it ruled that the Commonwealth made an impermissible reference to [Defendant's] post-arrest silence when it asked Detectives Kryder and Siget if [Defendant] made any claims of self-defense in his post-arrest interview that was shown to the jury?

2. Did the trial court abuse its discretion when it ruled that a recitation by the Commonwealth that quoted [Defendant's] interview was an exploitation of Appellee's post-arrest silence?

3. Did the trial court abuse its discretion when it ruled that the alleged "impermissible reference" was not harmless error, even though: (1) Appellee was acquitted of all crimes that the "reference" pertained to; (2) the "reference" was cumulative of the evidence presented; and (3) the evidence of Appellee's guilt for the crimes he was convicted of was overwhelming?

Commonwealth's Brief at 4.

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable Kim Tesla. We conclude that the Commonwealth is not entitled to relief in this case, for the reasons expressed in Judge Tesla's comprehensive, well-reasoned August 16, 2024 opinion. Therefore, we affirm on the basis of Judge Tesla's able opinion and adopt it as our own. In any future filing with this or any other

_____

Commonwealth claims that the trial court committed an error of law") and 311(d) (declaring that "the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

court addressing this ruling, the filing party shall attach a copy of Judge Tesla's August 16, 2024 opinion.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 08/01/2025

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-637-2023
: NO. 783 WDA 2024
V. :
:
DECARLOS KAVAUN WARREN, :
:
DEFENDANT :

TESLA, J.                                                  August **16**, 2024

# RULE 1925 OPINION

## I. INTRODUCTION

The matter before the Court is the Commonwealth's appeal of the Court's Order granting the Defendant's request in post-sentence motions for a new trial based on the Commonwealth's references to his post-arrest, post-*Miranda* silence during trial testimony and closing argument. In an opinion authored by Justice Brobson and joined by Chief Justice Todd and Justices Donohue, Dougherty, and Wecht, the Pennsylvania Supreme Court held that **"testimonial reference to a defendant's post-arrest silence is constitutionally off-limits; even a single reference, as reflected, risks reducing to rubble an entire prosecution."** Commonwealth v. Rivera, 296 A.3d 1141. 1157 (Pa. 2023) (emphasis added). In Rivera, the Supreme Court reversed the lower courts' rulings and granted the defendant a new trial finding that the prosecutor's questions to the arresting police trooper about whether the defendant had informed the trooper that he acted in self-defense were admitted in error as they violated the defendant's constitutional right to remain silent. Id. at 1157. The Court found that the error was not harmless based on the harmless error test discussed in Commonwealth v. Hairston, 624 Pa. 143, 84 A.3d 657 (2014). Id. at 1161. Justice Mundy wrote a concurring and dissenting opinion

1

agreeing with the Majority's conclusions of law but dissenting because she found that the issue was not properly preserved for appellate review. Id. at 1171-72.

Justice Wecht wrote separately in Rivera "to suggest how prosecutors can better avoid introducing prejudice into trials that implicate [the law on post-arrest silence]." Rivera, 296 A.3d at 1163 (Wecht, J., concurring). See also, id. at 1170-71. Justice Wecht observed that "[t]his area of law is perilous for prosecutors" because the "consequences for eliciting an answer from a witness that violates a privilege are severe" and the prejudice that results "is nearly incapable of being overcome, no matter how strong the balance of the Commonwealth's evidence is." Id. at 1170. Because "it is unnecessarily risky for prosecutors to delve into a defendant's silence in front of the jury without taking precautions to protect the case from prejudice and future reversal," Justice Wecht suggested that "[r]ather than diving straight into questions that implicate a defendant's decision to remain silent, prosecutors should put the issue to the trial court for a ruling before allowing the jury to hear it." Id. Justice Wecht further suggested that before a prosecutor asks any question that might implicate a defendant's pre- or post-arrest silence, "the prosecutor should ask for a sidebar, approach the bench, and get a ruling from the trial court." Id. at 1171. Doing so allows the trial court "the opportunity to keep the evidence out *before* the jury hears it" and thus prevents the "all-but certain reversal, and subsequent retrial" that questions about a defendant's silence so often require. Id. at 1170 (emphasis in original). In Justice Wecht's opinion, "[t]he risk is not worth the reward." Id. While Justice Wecht acknowledged that there is no legal principle requiring prosecutors to follow this protocol, "it is the best way to ensure that the jury is not exposed to highly prejudicial information that it was not permitted to hear." Id. at 1171. Requesting a sidebar before delving

2

into questions about a defendant's silence "would conserve limited judicial resources [and] avoid subjecting victims, police officers, and the defendant to the inevitable retrial." Id.

In Rivera, the defendant did not make any statements to law enforcement following his arrest. However, prior caselaw of the Pennsylvania Supreme Court shows that even a defendant who, after his arrest, first chooses to make some statements to law enforcement before later asserting his right to silence is protected against a prosecutor's references to things he did not say, because "[i]t is irrelevant whether a defendant elects to assert the constitutional right to remain silent from the outset or makes a voluntary statement and then asserts the right." Commonwealth v. DiPietro, 538 Pa. 382, 386, 648 A.2d 777, 779 (1994) (quoted with approval in Commonwealth v. Duffey, 573 Pa. 186, 203, 855 A.2d 764, 774 (2004)). This hardline rule results from the fact that "[t]he prejudice to the defendant resulting from reference to his silence is substantial." Commonwealth v. Turner, 499 Pa. 579, 583, 454 A.2d 537, 539 (1982).

Further, while testimonial references to a defendant's silence in themselves result in substantial prejudice against the defendant, "[w]hen a prosecutor exploits an accused's post-arrest silence during closing argument, the prejudice is compounded." Commonwealth v. DiPietro, 538 Pa. 382, 389, 648 A.2d 777, 781 (1994). The Pennsylvania Supreme Court has held that "testimonial reference to [a defendant's] post-arrest silence, the absence of an adequate cautionary instruction, and the further exploitation of [the defendant's] post-arrest silence during closing argument constitute reversible error and mandate a new trial." Commonwealth v. DiPietro, 538 Pa. 382, 392, 648 A.2d 777, 782 (1994). Our High Court has also found split jury verdicts to be significant in this arena, because "[t]he jury may have decided that the Commonwealth's case was significantly bolstered by the reference to [the defendant's] post-arrest silence and that it would be appropriate to impose a verdict more severe than acquittal but less

3

severe than murder." Commonwealth v. Turner, 499 Pa. 579, 583, 454 A.2d 537, 539 (1982) (citation and internal quotation marks omitted). In cases when a jury returns a split verdict, the Court cannot "be sure that the jury would have resolved the issue in the same manner absent the improper reference" to the defendant's post-arrest silence, and the Court should "not convinced beyond a reasonable doubt that the error did not contribute to the verdict." Id.

The case here arises from a multiple shooting at Harmony Dwellings in Beaver Falls, Pennsylvania, in July 2021. The shooting began when Defendant Decarlos Warren shot and killed Dwayne Wells in justified self-defense, and then escalated into a gunfight between Defendant and Dwelley Choice. During the shooting, Defendant shot and hit Dwelley Choice, his brother Daron Choice, and Tristen Nesmith, and Dwelley Choice shot and killed Defendant's brother Monte Warren, who was unarmed. After the shooting, Defendant returned to his home state of Michigan, where he was later found by local law enforcement and arrested in March 2023. Beaver County law enforcement transported Defendant from Michigan to the Beaver County Courthouse, where Detectives James Siget and Michael Kryder conducted custodial interrogation of the Defendant. During custodial interrogation, Defendant initially made some statements to law enforcement, mostly pertaining to their decision not to arrest and charge Dwelley Choice for the death of his brother Monte Warren. Defendant was told that the then-District Attorney, David Lozier, made the decision not to charge Dwelley Choice with the death of Monte Warren. Defendant claimed that he did not start the confrontation that escalated to a gun-fight and that he did not have a side in the fight, but when asked to tell his side of the story he told the detectives that they would learn his side of the story in court after he had spoken with his lawyer. Upon repeated questioning about his side of the story, the custodial interrogation

4

concluded after Defendant told the detectives that he would not talk to them anymore until he had spoken with his lawyer. Defendant never made any more statements to law enforcement.

At trial, Defendant argued that he shot and killed Dwayne Wells in an act of justified self-defense. Defense counsel gave an opening statement before the Commonwealth's case-in-chief informing the jury that their argument in trial would be self-defense. During its case-in-chief, the Commonwealth presented testimony from the two Beaver County detectives who had conducted the custodial interrogation of Defendant, Detective Captain James Siget and Detective Michael Kryder. Assistant District Attorney Connor Battin asked both detectives if Defendant told ever them that he was acting in self-defense, and both detectives testified that Defendant had not. During closing argument, A.D.A. Battin commented on the detectives' testimony by characterizing Defendant's self-defense claim as "a story that he would not give Kryder or Siget." N.T., Trial Vol. VIII, 2/12/2024, at 82. Following deliberation, the jury found Defendant not guilty of criminal homicide of Dwayne Wells, three counts of attempt to commit criminal homicide of Dwelley Choice, Daron Choice, and Tristen Nesmith, and both aggravated assault counts of Tristen Nesmith under 18 Pa. C.S.A. § 2702(a)(1) and 18 Pa. C.S.A. § 2702(a)(4). The jury found Defendant guilty of aggravated assault against Dwelley Choice and Daron Choice under 18 Pa. C.S.A. § 2702(a)(1) and 18 Pa. C.S.A. § 2702(a)(4), and three counts of recklessly endangering another person under 18 Pa. C.S.A. § 2705. Following trial, Defendant also plead guilty to one count of persons not to possess a firearm under 18 Pa. C.S.A. § 6105 following trial.

Following sentencing, on April 11, 2024, trial counsel Ryan Gailey, Esquire, filed timely post-sentence motions raising eight issues, including the claim that the Commonwealth's reference to Defendant's post-arrest, post-*Miranda* silence warranted a new trial. The Court

5

granted the Defendant's request for a new trial based on the Commonwealth's clear references to the Defendant's post-arrest silence, that he did not tell the charging detectives that he acted in self-defense during custodial interrogation. The Court denied the issues remaining in Defendant's post-sentence motions. After careful consideration and review of the record in this case and the caselaw of the Pennsylvania Supreme Court on post-arrest silence, the Court concluded that the law required granting Defendant a new trial based on the Commonwealth's constitutionally impermissible and deliberate references to Defendant's post-arrest silence elicited by the Commonwealth during direction-examination of the case detectives and referenced again during closing argument. The Court did not take this decision lightly, and had attempted to avoid this outcome by providing counsel for both parties with the Rivera decision before trial, and by reminding them of the case during trial, since the decision was recently announced in June 2023. See, N.T., Trial Vol. III, 1/31/2024, at 234-35.

Pennsylvania Rule of Appellate Procedure 1925(a)(1) provides, in part, that "upon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall forthwith file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found." Pa. R.A.P. 1925(a)(1).

The Court has determined that the reasons for the appealed Order have been set forth in the Post-Sentence Opinion dated June 5, 2024. The Post-Sentence Opinion also disposed of other claims raised by the Defendant in his Post-Sentence Motions, so what follows in this 1925 Opinion is an abridged version of the Post-Sentence Opinion with some minor edits for clarity. The Court has redacted the portions of the Post-Sentence Opinion that address issues that have

6

not been raised on appeal, as Defendant has elected not to pursue a cross-appeal in this case. The redacted portions include analyses of Defendant's claims concerning the sufficiency of the evidence, the weight of the evidence, and prosecutorial misconduct. The Beaver County Clerk of Courts is hereby directed to file the record of these proceedings with the Superior Court of Pennsylvania.

## II. PROCEDURAL POSTURE

On July 16, 2021, Captain James Siget of the Beaver Falls Police Department and co-affiant Detective Michael Kryder filed a criminal complaint at CR-198-2021 following a shooting incident that occurred on July 12, 2021. The criminal complaint charged Defendant with criminal homicide of Dwayne Wells under 18 Pa. C.S.A. § 2501(a), three counts of attempt to commit criminal homicide under 18 Pa. C.S.A. § 901(a) and § 2501(a), three counts of aggravated assault under 18 Pa. C.S.A. § 2702(a)(1), three counts of aggravated assault with a deadly weapon under 18 Pa. C.S.A. § 2702(a)(4), three counts of recklessly endangering another person ("REAP") under 18 Pa. C.S.A. § 2705, and one count of persons not to possess a firearm under 18 Pa. C.S.A. § 6105(a)(1). On the same date, Magisterial District Judge Joseph Schafer issued a warrant for Defendant's arrest. The warrant for Defendant's arrest was placed into NCIC by law enforcement.

Based on their investigation law enforcement concluded that Defendant was no longer located in Beaver County, and that he had fled to the state of Michigan. A day or two after the shooting, Captain Siget contacted Matt Roth of the United States Marshals Fugitive Task Force to ask for assistance in the apprehension of Defendant. Jack McClain[1] of the Fugitive Task Force testified that the Pittsburgh branch of the Fugitive Task Force contacted the task force in

---

[1] When Deputy Marshal Roth retired in April 2022, Deputy Marshall Jack McClain took over the investigation into Defendant's whereabouts. Deputy Marshall McClain testified at the omnibus motion hearing on October 26, 2023.

Michigan in order to find Defendant. The Michigan branch of the Fugitive Task Force, in turn, enlisted the aid of the Michigan State Police. At the October 26, 2023, hearing on Defendant's Omnibus Pretrial Motion, Trooper Brandon Kelly of the Michigan State Police and the U.S. Marshals Task Force testified to their efforts to locate Defendant from July 2021 to March 2023. The Michigan State Police contacted Defendant's family members to alert them of the warrant for Defendant's arrest. They placed Defendant on the most wanted list in Michigan state. They investigated the records of medical facilities in Michigan to determine whether Defendant had obtained medical treatment for the injuries he sustained during the shooting, but this search had no results. Michigan State Police also conducted surveillance in an attempt to locate Defendant.

Finally, on March 16, 2023, Defendant was arrested by Michigan State Police in Jackson County, Michigan. On March 20, 2023, Defendant waived his right to an extradition hearing. On March 23, Beaver County sheriffs and Detective Michael Kryder transported Defendant back to Beaver County, Pennsylvania. During transport back to Beaver County, Detective Kryder orally provided Defendant with Miranda warnings.

On March 23, 2023, after being transported to Beaver County from Michigan, Detective Kryder and Captain Siget conducted a video-taped custodial interview of Defendant prior to his arraignment. (Cmwlth's Ex 59; discussed in detail below). After a few minutes of talking, Defendant indicated that he did not want to talk further with the police until after he talked to his attorney. At that point, Detective Kryder and Captain Siget ended the interview.

Following a preliminary hearing held on April 13, 2023, before Magisterial District Justice Robert Dappenbrook, Defendant was held for court on all criminal charges contained in the criminal complaint. Trial was initially scheduled at the preliminary hearing for September 11, 2023.

The Commonwealth filed an Information on May 31, 2023, charging Defendant with the same offenses charged in the criminal complaint: one count of criminal homicide (murder),[2] three counts of criminal attempt to commit criminal homicide,[3] three counts of aggravated assault,[4] three counts of aggravated assault with a deadly weapon,[5] three counts of REAP,[6] and one count of persons not to possess a firearm.[7] On June 6, 2023, Defendant was arraigned in-person by the Court and was represented by Attorney Ryan Gailey, Esq. Attorney Gailey formally entered his appearance on June 9, 2023, and represented Defendant through trial and sentencing.

After continuing trial to the September 11, 2023, trial term and after receiving several time extensions, on August 28, 2023, Counsel for Defendant filed an Omnibus Pretrial Motion. The Court held a hearing on the omnibus pretrial motion on October 26, 2023 and November 6, 2023. The Court issued an Opinion denying Defendant's Omnibus Pretrial Motion on December 5, 2023.

On January 12, 2024, Defendant filed a Motion to Sever Count 14 — Person not to Possess a Firearm, 18 Pa. C.S.A. § 6105 — from all other counts. The Court entered an Order on January 26, 2024, granting the motion and severing Count 14 from all other counts for trial purposes.

On the day jury selection was scheduled to begin, January 29, 2024, Defendant filed a Motion to Dismiss. In his Motion, Defendant raised several claims of prosecutorial misconduct, including allegations of improper interference with potential defense witness Sam Piccinini,

---

[2] 18 Pa. C.S.A. § 2501(a).
[3] 18 Pa. C.S.A. § 901(a); § 2501(a).
[4] 18 Pa. C.S.A. § 2702(a)(1).
[5] 18 Pa. C.S.A. § 2702(a)(4).
[6] 18 Pa. C.S.A. § 2705.
[7] 18 Pa. C.S.A. § 6105(a)(1).

failure to disclose consideration offered for the testimony of Cheyenne Ambrose, an alleged Brady violation concerning additional camera views of the criminal incident, and false testimony and discovery violations concerning a photographic identification of Defendant made by Lashonna Haves-Owens. The Court denied Defendant's Motion to Dismiss without prejudice on the record in open court on January 29, 2024.[8]

Jury selection in this matter began on Monday, January 29, 2024, and concluded on Wednesday, January 31, 2023. The Commonwealth began its case-in-chief on Thursday, February 1, 2024 and concluded its case on Thursday, February 8, 2024. The Defense presented two days of testimony, and concluded its case on Friday, February 9, 2024. After closing argument and final instructions, the jury spent about 16 hours in deliberation. On February 14, 2024, the jury found Defendant not guilty of first-degree murder, third-degree murder, and voluntary manslaughter for the death of Dwayne Wells. In addition, the jury returned a verdict of not guilty for the attempted murders of Tristen Nesmith, Daron Choice, and Dwelley Choice. The jury found Defendant not guilty of the aggravated assault of Tristen Nesmith under § 2702(a)(1) and § 2702(a)(4), but found him guilty of the aggravated assaults of Daron Choice and Dwelley Choice under both § 2702(a)(1) and § 2702(a)(4). Lastly, the jury found Defendant guilty of recklessly endangering Daron Choice, Dwelley Choice, and Tristen Nesmith.

---

[8] The issues raised in the Motion to Dismiss were resolved on January 29, 2024 or shortly thereafter. First, the Court notes that defense witness Sam Piccinini was willing to testify despite the allegations of witness tampering, but Defendant and his counsel elected not to call Mr. Piccinini to testify. Second, the Commonwealth did not call Cheyenne Ambrose to testify at trial. The defense called Ms. Ambrose to testify in their own case-in-chief, and during that testimony defense counsel brought out the alleged threats made to Ms. Ambrose. Third, the Commonwealth provided the additional camera-views of the criminal incident to defense counsel at the time he entered the Motion to Dismiss. Lastly, the Commonwealth acknowledged the potential problems with Lashonna Haves-Owens' photographic identification of Defendant, and informed the Court that it would not present that identification at trial. Defense counsel did not request to continue trial based on his Motion to Dismiss, and dismissal of the case was not warranted because there was no prejudice to Defendant. If there was a possibility of prejudice to Defendant the Court would have granted any motion to continue trial.

10

On March 14, 2023, Attorney Gailey filed an Application for Leave to Argue an Oral Motion for Extraordinary Relief pursuant to Pa. R. Crim. P. 704(B). The Court scheduled and held oral argument on Defendant's Motion on March 25, 2024. Pursuant to his Motion, Defendant requested a new trial based on several references to his post-arrest silence that the Commonwealth made during its case-in-chief and its closing argument, which Defendant argued violated his post-arrest right to remain silent under Rivera and related Pennsylvania caselaw. The Court entered an Order denying Defendant's Motion for Extraordinary Relief on April 2, 2024. In that Order, the Court stated that, "[b]ased on the current uncertainty of this area of the law, the Court does not believe that a Motion for Extraordinary Relief is the proper avenue to fully explore the issues posed by the Commonwealth's references to Defendant's post-arrest silence in this case." Order, 4/2/2024, at 4. The Court explained in the Order that extraordinary relief should be granted for "only those errors so manifest that immediate relief is essential" prior to sentencing. Pa. R. Crim. P. 704, cmt. Although Defendant had a strong argument that the Commonwealth's references to his post-arrest silence warranted a new trial, the error of referencing Defendant's post-arrest silence was not so clear at that stage of the litigation to immediately warrant extraordinary relief. However, the Court was greatly concerned with this issue, and so the Order stated that the Court denied Defendant's Motion for Extraordinary Relief **without prejudice**, and further stated that "Defendant may re-raise the issues raised in his Motion for Extraordinary Relief again in Post-Sentence Motions[.]" Order, 4/2/2024, at 5. After Defendant filed his post-sentence motions, and upon further reflection and with the benefit of further analysis of Rivera and related caselaw, the Court concluded, based on the strong and clear language used by the Pennsylvania Supreme Court in Rivera, that the error created by the Commonwealth's references to Defendant's post-arrest silence concerning whether Defendant

11

acted in self-defense required the Court to grant Defendant's request for a new trial, as explained below in this Opinion.

The Court held a sentencing hearing on April 2, 2024. At that time, Defendant entered a guilty plea to Count 14, Person not to Possess a Firearm, 18 Pa. C.S.A. § 6105. Following the entry of his guilty plea and after conducting a guilty plea colloquy, the Court sentenced Defendant to an aggregate term of imprisonment of 5-10 years. Specifically, the Court imposed the following sentences:

- At Count 5, aggravated assault under 18 Pa. C.S.A. § 2702(a)(1), the Court sentenced Defendant to serve a term of imprisonment of not less than five nor more than ten years;
- At Count 6, aggravated assault under 18 Pa. C.S.A. § 2702(a)(1), the Court sentenced Defendant to serve a term of imprisonment of not less than five nor more than ten years;
- At Count 8, aggravated assault with a deadly weapon under 18 Pa. C.S.A. § 2702(a)(4), the Court sentenced Defendant to serve a term of imprisonment of not less than two nor more than ten years;
- At Count 9, aggravated assault with a deadly weapon under 18 Pa. C.S.A. § 2702(a)(4), the Court sentenced Defendant to serve a term of imprisonment of not less than two nor more than ten years;
- At Count 11, REAP under 18 Pa. C.S.A. § 2705, the Court sentenced Defendant to serve a term of imprisonment of not less than one nor more than two years;
- At Count 12, REAP under 18 Pa. C.S.A. § 2705, the Court sentenced Defendant to serve a term of imprisonment of not less than one nor more than two years;
- At Count 13, REAP under 18 Pa. C.S.A. § 2705, the Court sentenced Defendant to serve a term of imprisonment of not less than one nor more than two years; and
- At Count 14, person not to possess a firearm under 18 Pa. C.S.A. § 6105, the Court sentenced Defendant to serve a term of imprisonment of not less than three nor more than six years.

All of the above sentences were ordered to run concurrent to one another for the aggregate sentence of 5-10 years' imprisonment.

Immediately following sentencing, on April 2, 2024, at 12:04 P.M., Attorney Gailey filed a Motion to Withdraw as Counsel. Although the Court initially denied Attorney Gailey's request

to withdraw, after a posttrial conference held on May 1, 2024, to determine the status of Attorney Gailey's representation the Court entered an Order appointing the Public Defender's Office to represent Defendant based on Defendant's financial inability to continue retaining Attorney Gailey. On May 2, 2024, Assistant Public Defender Kevin Kindred filed a Motion for Conflict Counsel. On the same day, the Court granted the motion and appointed Attorney Frank Martocci, Esq., as Conflict Counsel. The Court entered an Order granting Attorney Gailey permission to withdraw his appearance on May 14, 2024.

Attorney Gailey filed a Motion for Post-Sentence Relief on Defendant's behalf on April 11, 2024 before the Court granted him permission to withdraw his appearance. In his post-sentence motion, Defendant requested a new trial and/or judgement of acquittal based on the Commonwealth's references to his post-arrest, post-Miranda silence during the testimony of Detective Michael Kryder and Detective Captain James Siget, and the reference to that testimony during closing argument, among other claims that are not relevant to this appeal.

## III. FACTS ESTABLISHED AT TRIAL

The evidence presented at trial was sufficient to sustain the jury's verdict. The evidence established the following facts:[9]

In July 2021, Alante Lindsey, from Ypsilanti, Michigan, was in Beaver County Pennsylvania, visiting his friend Monte "Lucky" Warren, who had been living in the Beaver County area for years. On July 12, 20221, Lindsey went to Harmony Dwellings, a public housing

---

[9] Although the sufficiency of the evidence is not challenged on this appeal, the Court has provided the following factual summary to provide insight into the split/compromise verdict returned by the jury in this case. The Pennsylvania Supreme Court in both Turner and Rivera emphasized that a jury's compromise verdict is significant evidence that a reference to the defendant's post-arrest silence was not harmless error. Turner, 454 A.2d at 539 (stressing that compromise verdicts are an important factor when determining whether a reference to a defendant's post-arrest silence was harmless error because the "jury may have decided that the Commonwealth's case was significantly bolstered by the reference to [the defendant's] post-arrest silence and that it would be appropriate to impose a verdict more severe than acquittal but less severe than murder."); Rivera, 296 A.3d at 1161 (awarding the defendant a new trial based, in part, on the jury's split verdict).

13

complex maintained by the Beaver County Housing Authority, to meet some friends at Tiara Fair's apartment.[10] When Lindsey arrived at Fair's apartment, there were about four to five people there. At one point, a man with a hoodie, later identified as Dwayne "Wild Wayne" Wells, entered the apartment without knocking while Fair was not present at the apartment. The man, who was unknown to Lindsey and the others in the apartment, went straight to the kitchen after entering the apartment. The man returned to the living room with a bottle of alcohol, took a shot of liquor, and then looked at every person in the apartment straight in the eyes individually. The man stated that the apartment was his sister's and that he had to use the bathroom. However, the man, *i.e.*, Wells, left the apartment without ever using the bathroom. Wells crossed the street and took a phone call. After Wells left, Lindsey called Defendant and his brother Monte and told them that Wells's behavior was making him paranoid and worried that something bad was going on.

On July 12, 2021, Defendant was in Beaver Falls, Pennsylvania visiting his brother, Monte Warren. In the evening hours of that day, Defendant left his hotel in a white GMC SUV and drove to Harmony Dwellings. Defendant originally planned on dropping a friend off at Harmony Dwellings and then going to the mall, but once he arrived at Harmony Dwellings Defendant noticed Monte there, so he decided to stay at Harmony Dwellings. Defendant stayed in his car at first to finish a phone call. While he was still in his car, Defendant observed an unknown male enter the apartment where his friends were. After he finished his phone call, Defendant got out of his car and walked toward the apartment. Defendant entered the apartment through the backdoor as Wells left through the front door. Alante Lindsey informed Defendant that Wells had entered the apartment and how he behaved in a threatening manner toward the

---

[10] At trial, Lindsey testified that Fair's apartment is in the third house on the left when driving into Harmony Dwellings. (Cmwlth's Ex. 6).

14

people in the apartment. Defendant saw that Wells's intrusion had made everyone inside the apartment nervous and agitated because they could not understand what Wells was doing in the apartment. At that point, Tiara Fair reentered the apartment and told the group that the man who had entered the apartment was Dwayne Wells. Fair informed the others that Wells was cussing her out and telling her to "get them niggas out of here." The group stayed inside the apartment for about seven minutes in total after Defendant arrived, trying to decide how to proceed. Defendant and his brother Monte Warren made the decision to try to leave Harmony Dwellings.

Having decided to get out of the area, the group inside Fair's apartment exited the apartment and made their way towards the black Jeep. When they walked outside of the apartment, they heard an unidentified male, later identified as Tristen Nesmith, shouting belligerently at Defendant's group. As they were leaving, they ran into Jaezyn "Philly" Baker in front of Monte Warren's black Jeep. Baker, who was friends with both Dwayne Wells and Monte Warren, had left a friend's birthday party to come to Harmony Dwellings because Wells had asked him to go down to Harmony Dwellings with him. Wells had told Baker "you better tell these niggas who the fuck I am." Baker testified that when he arrived he spoke with Monte Warren and his brother, Defendant.

As Defendant and his brother were talking to Baker, Dwayne Wells' group of about eight or nine individuals began converging on their position and stationing themselves at the exit-road out of Harmony Dwellings. Baker testified that Tristen Nesmith, a member of Wells's group, was drinking and getting rowdy, so Baker tried to get him to calm down and leave the scene. Wells was also getting rowdy at that point. According to Baker, Wells was "gassed up." Defendant and his group believed that Wells and his associates would attempt to prevent them from leaving the housing complex, and they were afraid that if they attempted to drive away

from the area then Wells's group would shoot at their vehicles. Lindsey testified that he thought that Wells and his friends would kill Defendant, Monte Warren, Lindsey, and their friends if they tried to leave. Defendant had initially told his friends to get in their cars to leave, but as Defendant grew fearful that they would get shot at if they attempted to drive away, he and his friends got back out of their cars.

While Defendant, Monte Warren, and their friends were still standing in front of the black Jeep discussing what to do, Daron Choice and his brother Dwelley Choice began approaching, and one of the brothers stood in front of the black Jeep. Defendant had never met the Choice brothers at this point, and did not know who they were. Defendant then heard Tristen Nesmith yell to Philly "fuck them niggas Philly!" Nesmith continued yelling profanities at Defendant and his group. At trial, Nesmith testified that he and Wells planned to "run down" Defendant and his group. Nesmith further testified that to "run down" means to confront somebody or to check somebody. Nesmith explained that the term can mean anything from engaging in a fist-fight to shooting people with a firearm.

As Defendant, Monte Warren, and their group were still trying to leave, Dwayne Wells got back out of Lashonna Haves-Owens's car and began aggressively approaching the group in front of the black Jeep, waving his arms around and clapping his hands. At the same time, there were more cars driving up to the exit of Harmony Dwellings, and more people approaching Harmony Dwellings on foot. Baker testified at trial that although no one had called for reinforcements, it looked like someone had. Baker further testified that the new cars and people put the Warrens in a defensive position, saying specifically that he would have felt threatened if he was not from the area.

As he approached, Wells was shouting at Defendant and his group, saying things like "fuck them niggas, better tell them who I am," "this shit ends tonight," and "we run these projects." As he got closer to the group, Wells put his hand in his hoodie pocket and moved it around inside the pocket. Once he got to the group, Wells shouted "you niggas won't make it out of here" right in Defendant's face. Alante Lindsey testified at trial that he saw the back of a gun poking out of Wells's pocket as he approached the group. At this point, according to Defendant's testimony, Wells tried to pull something out of his hoodie pocket, but it got stuck inside the pocket as he tried to pull it out. Defendant, believing that Wells was attempting to pull a firearm out of his pocket, pulled his own firearm out and shot and hit Wells.[11] Wells died at the scene from the gunshot wounds he suffered to his trunk. (Cmwlth's Ex. 64, Stipulation 19). Immediately after Defendant shot Wells, the group in front of the black Jeep scattered, with people running away from the gunshots.

After shooting Wells, Defendant continued firing his gun at the remaining members of Wells's group. Defendant shot at Daron Choice, who was still in close proximity to Defendant's position but was in the process of running away from the gunshots. Daron Choice was hit in the back, abdomen, and right elbow. (Cmwlth's Ex. 64, Stipulations 17). Once Dwelley Choice, who was also running away from the gunshots, saw that his brother had been shot and had collapsed on the ground in the middle of the road leading out of Harmony Dwellings, he pulled his own firearm and began firing at Defendant. When Dwelley Choice began firing, Defendant retreated behind the black Jeep and the other cars on that side of the road for cover, and then Defendant and Dwelley Choice began exchanging gunfire. During this gunfight, Dwelley Choice shot Monte Warren, who was unarmed. Monte Warren collapsed near the black Jeep after being

___

[11] Review of the Beaver County Housing Authority video, Commonwealth's Exhibit 6, shows that at the time Defendant shot Wells, the video's view of Wells is obstructed by another individual so that the video neither corroborates nor contradicts Defendant's testimony that Wells attempted to pull a firearm out of his hoodie.

17

shot.[12] Defendant was also shot during the gunfight. While he was covering behind the white GMC SUV, Defendant was shot in the foot. Samples of the blood from the gunshot wound to Defendant's foot were later recovered at the crime scene by law enforcement. Defendant also shot and hit Dwelley Choice in his right flank, his left abdomen, his back, and his right leg. (Cmwlth's Ex. 64, Stipulation 18).

After exchanging gunfire with Dwelley Choice for about thirty seconds, Defendant noticed that the slide of Dwelley Choice's gun was locked back and that he was out of ammunition. Seeing this, Defendant exited from behind the cover of the white GMC and began moving back toward the black Jeep and his wounded brother. Defendant shouted for Monte Warren to get up, and then shouted at Dwelley Choice to "get back," while aiming his firearm at him. (Cmwlth's Exs. 6, 7-K). Defendant and Monte Warren then got into the black Jeep and drove away from the scene. Notably, as Defendant was driving out of Harmony Dwellings, he drove around Daron Choice, who was standing in the middle of the road. After they had driven away from Harmony Dwellings, Monte Warren threw the gun that Defendant had used at the scene out of the car and into some bushes.

Michael Jones, a confidential police informant who had worked with Captain Siget previously, testified at trial that on July 12, 2021, he was on 10th Avenue and 13th Street in Beaver Falls with Akhil Solomon. At that time, Jones noticed something get thrown out of the passenger's side of a passing car. Once the car was gone, Solomon used a plastic bag to pick the object up. Jones saw that the object was a gun. Jones then watched as Solomon took the bag with the gun in it across the nearby train-tracks toward the Beaver River. When Solomon returned to

---

[12] The District Attorney's Office made the decision not to charge Dwelley Choice with the death of Monte Warren because they believed that Dwelley Choice killed Monte Warren in justifiable self-defense.

18

Jones he no longer had the bag or the gun. The firearm was later recovered from the Beaver River by law enforcement. (Cmwlth's Exs. 27-29).

After driving away from Harmony Dwellings, Defendant first stopped briefly at a nearby fire department to see if he could get help for his brother, who was dying of the gunshot wound inflicted by Dwelley Choice. Defendant quickly drove away from the fire department and called his girlfriend, Taylor Pavick. Pavick, who was out with her child and her cousin Myah Hunter at the time, answered Defendant's call, and Defendant told her that his brother was dying and to meet him at her home at 816 Whipple Court, Beaver Falls. When Pavick returned to her house, Defendant and his brother were already there. Monte Warren was collapsed in the passenger's seat of the black Jeep covered in blood. Pavick immediately got in the black Jeep and drove Monte Warren to Heritage Valley Hospital Beaver. Monte Warren later died at Heritage Valley Hospital.

Back at 816 Whipple Court, Defendant entered the house through the backdoor, leaving stains of blood around the back door. (Cmwlth's Exs. 30-32). According to Defendant, he dropped his cell phone on the concrete stairs leading to the backdoor of the house. Defendant testified that his phone was not operable past this point. Once inside, Defendant asked Pavick's cousin Myah Hunter for a towel for his shot foot to clean up the wound. Defendant also got hot water and bleach to clean up the blood he had tracked into Pavick's kitchen. Defendant then asked Hunter to take the trash out.

Defendant then left 816 Whipple Court and returned to his hotel in Chippewa. Later, Defendant got a ride back to his home in Michigan from a mutual friend. Defendant stayed at his home at 1022 Nash Avenue in Ypsilanti, Michigan for about two to three months while his foot

19

healed, then he went to Jackson, Michigan, where he was eventually apprehended by law enforcement.

At trial, Defendant testified that he shot Dwayne Wells in self-defense. He testified that Wells's aggressive behavior made him afraid for his own life and the lives of his friends, and his brother. He testified that he was not very familiar with Harmony Dwellings or the surrounding area. Defendant stated that he knew that there was a fence surrounding the housing complex, and that the only person he knew who lived in Harmony Dwellings was Tiara Fair. Because of his unfamiliarity with the area, Defendant did not know any way to get out of Harmony Dwellings other than the main road leading into the housing complex. Defendant testified that after Wells approached, everything happened so fast that he did not have enough time to retreat given his unfamiliarity with the area and Wells's aggressive behavior.

Cheyenne Ambrose, who was familiar with Dwayne Wells through the mother of Wells's child, testified at trial on behalf of the Defense. Ambrose testified that Wells was planning to rob Defendant and his friends on the day of the shooting. Ambrose stated that Wells told her that he had a plan to rob Taylor Pavick's boyfriend, *i.e.*, Defendant.

A few days after the shooting, Tristen Nesmith contacted Taylor Pavick through Facebook messenger using his girlfriend's Facebook account. Nesmith told Pavick that he wasn't sure if the shooting was his fault or not, and that he was sorry. (Def's Ex. A). Several months later, on October 23, 2021, Nesmith went to Pavick's home at 816 Whipple Court in an apparent attempt to intimidate or threaten her about her involvement with this case. A surveillance video showing the front porch and door of 816 Whipple Court depicting the incident was admitted into evidence at trial. (Def's Ex. D). The video shows a car pull up and park near 816 Whipple Court driven by Seniquoa Barnes, Tristen Nesmith's girlfriend. Nesmith exited the vehicle and walked

toward the front door of 816 Whipple Court. Pavick testified that she had not invited Nesmith to her home, and that at that time she was afraid of Nesmith because he had been going around town and talking about her involvement with the case. In the video, Barnes, still in the car, shouted at Nesmith "you don't have shit," which Pavick took to mean that Nesmith was unarmed. Nesmith responded to Barnes saying "what does that have to do with my hands," a statement which Pavick took as a threat of physical violence toward her. Pavick was afraid that Nesmith would physically attack her. After knocking on the door a couple times and trying to get Pavick's attention, Nesmith eventually went back to Barnes's car and left. Pavick called the Beaver Falls Police Department about this incident and may have spoken with Captain Siget, but the police did not follow up regarding this incident. Pavick called the Beaver Falls Police Department numerous times between the shooting and trial. On July 22, 2022, Pavick called the police to inform them about some concerning things she had been hearing about the case, including the potential location of Nesmith's firearm. Pavick testified that Captain Siget told her that her claims were hearsay and that the police would not do any investigation about her claims.

The most crucial piece of the Commonwealth's evidence presented at trial was a surveillance video of the Harmony Dwellings parking lot obtained from security cameras maintained by Beaver County Housing Authority which shows that Defendant was confronted by a group of several seemingly-hostile individuals. (Cmwlth's Ex. 6). The surveillance video shows a group of people congregating in front of a black Jeep SUV, one of the people in that group being later identified as Defendant.[13] Several individuals are seen walking into Harmony Dwellings toward the group of people. The video then shows that an individual later identified as

---

[13] The Court notes that a facial identification of the shooter cannot be made from the Beaver County Housing Authority's surveillance video. However, at trial the Commonwealth presented stipulations concerning DNA evidence obtained from blood swabs from the crime scene and 816 Whipple Court that establish Defendant's identity as the initial shooter depicted in the surveillance video. (Cmwlth's Ex. 64, Stipulations 10-15).

21

Dwayne Wells got out of a red car and rapidly approach the group standing in front of the black Jeep. The camera's view of Wells becomes obstructed by other people once he reaches the group in front of the Jeep so the video does not show whether Wells was armed, but the video does show Defendant extend his arm and fire a handgun at Wells multiple times. The video then shows that Defendant continued to fire his gun as Wells and the rest of the group began running away from the gunshots. The video shows that after Daron Choice was hit and collapsed, Dwelley Choice turned around, pulled out a firearm, and began returning fire toward Defendant and his brother Monte Warren. Defendant retreats behind the parked cars for cover, and then he and Dwelley Choice exchange gunfire for about half a minute. During this segment of the video, Defendant can be seen limping as he makes his way back to the black Jeep. Finally, Defendant leaves the scene in the black Jeep accompanied by Monte Warren.

Based on the evidence establishing the above facts, the jury found Defendant not guilty of the homicide of Dwayne Wells, the attempted homicides of Daron Choice, Dwelley Choice, and Tristen Nesmith, and the aggravated assaults of Tristen Nesmith. The jury found Defendant guilty only of the aggravated assaults of Daron and Dwelley Choice, and of recklessly endangering Daron and Dwelley Choice, as well as Tristen Nesmith.

## IV. ANALYSIS

**The Commonwealth's repeated references to Defendant's post-arrest silence were constitutionally impermissible and warrant a new trial.**

The crucial issue in this case is whether the Commonwealth's references to Defendant's post-arrest silence at trial violated his right to remain silent under the U.S. and Pennsylvania Constitutions. For the reasons explained below, the Court concluded that the caselaw of the Supreme Court of Pennsylvania, most notably the recent case of <u>Commonwealth v. Rivera</u>, 296

A.3d 1141, 1142 (Pa. 2023), constrained this Court to grant Defendant a new trial based on the Commonwealth's repeated references to his post-arrest, post-Miranda silence at trial.

The consequences of referencing a defendant's silence at trial varies depending on whether the reference was made to a defendant's *pre*-arrest silence or to his *post*-arrest silence. See, Rivera, 296 A.3d at 1142. While "a mere reference to **pre**-arrest silence does not constitute reversible error where the prosecution does not exploit the defendant's silence as a tacit admission of guilt[,]" Commonwealth v. McGriff, 2017 PA Super 118, 160 A.3d 863, 868–69 (2017) (emphasis added) (citing Commonwealth v. Adams, 628 Pa. 600, 601, 104 A.3d 511, 513 (2014) (plurality)), a "testimonial reference to a defendant's **post**-arrest silence is constitutionally off-limits[.]" Commonwealth v. Rivera, 296 A.3d 1141, 1142 (Pa. 2023). "[E]ven a single reference" to a defendant's post-arrest silence "**risks reducing to rubble an entire prosecution.**" Id. (emphasis added). This is the case even when the defendant takes the stand in his own defense. Id. at 1145 (noting that the defendant in Rivera testified in his own defense).

At trial in this case, the Commonwealth made several references to Defendant's post-arrest silence. First, during its case-in-chief, the Commonwealth recalled Detective Michael Kryder, one of the two detective-affiants of this case, to the stand. Detective Kryder, who had already testified previously during trial, was recalled to lay the foundation for a video-taped interview that he and Detective Captain Siget had conducted of the Defendant after his arrest and return to Beaver County. (Cmwlth's Ex. 59).[14] During cross examination, defense counsel brought out the fact that there was no video of when Detective Kryder provided Defendant with his Miranda warnings, and he emphasized several statements Defendant made to Detectives Kryder and Siget in the video. On redirect examination, Assistant District Attorney Battin asked

---

[14] Only part of the video-tape of the interview, which is discussed more fully below, was admitted as Commonwealth's Exhibit 59 and shown to the jury.

23

Detective Kryder "Did the, when you did this interview for Mr. Warren or at any time did Mr. Warren ever say he shot in self defense?" N.T., Trial Vol. V, 2/7/2024, at 87. Detective Kryder answered "No." Id. Immediately following this question to Detective Kryder, the Commonwealth called the other affiant, Detective Captain James Siget, to the stand. On direct examination, A.D.A. Battin asked Captain Siget "Is there any information given to you [at the interview] that pertains to self defense?" Id. at 180. Captain Siget replied that "There was not." Id. Finally, during closing argument, A.D.A. Battin made the following reference to the earlier testimony:

> [Defendant] had the opportunity to hear all the evidence and then tell you his side
> of the story, a story that he would not give Kryder or Siget.

N.T., Trial Vol. VIII, 2/12/2024, at 82. After A.D.A. Battin concluded his closing argument, defense counsel objected to the comments regarding Defendant's post-arrest, post-*Miranda* silence. Id. at 114. Defense counsel claimed that A.D.A. Battin's comments on Defendant's post-arrest silence were "in direct contravention to the Pennsylvania Constitution Article I, Section 9 that even by mentioning it it is a serious and grave issue." Id. This Court commented that it had provided both counsel with the Rivera case, and noted that under that case a reference to a defendant's post-arrest silence is constitutionally off-limits. Id. at 114, 123-24.[15]

Review of the videotape of the custodial interrogation of Defendant shows that Defendant invoked his right to remain silent and his right to counsel during the interview. (Cmwlth's Ex. 59).[16] See, e.g., Commonwealth v. Lukach, 649 Pa. 26, 41, 195 A.3d 176, 185 (2018) (internal quotation marks and citations omitted) ("We have long held if an individual is given the *Miranda* warnings and responds that he wishes to exercise any of those rights, all interrogation must

[15] At no point were curative instructions requested or given to the jury at trial in this matter.
[16] At trial, the Commonwealth played Exhibit 59 from its beginning to timestamp 3:18, then from timestamp 4:10 to 5:15.

24

cease."). Following his arrest and transport back to Beaver County, Defendant was taken to Beaver County Courthouse where he was interviewed by Detective Kryder and Captain Siget. After Captain Siget confirmed that Detective Kryder had already provided Defendant with his *Miranda* warnings, Detective Kryder asked Defendant if he had any questions. Defendant indicated that he did, and asked "Why am I the only one in jail? My brother died too." Detective Kryder told Defendant that he was in jail "because you fired first." Defendant repeated the statement back to Detective Kryder in a questioning tone, stating "I fired first?" Detective Kryder then asked "Am I wrong?" Defendant replied "I don't know, you tell me. Is it wrong or is it right?" After asking several questions about the surveillance video that depicts the shooting, (see Cmwlth's Ex. 6), Defendant again asked why no one was in jail for the death of his brother, Monte Warren. Detective Kryder explained that the decision of whether to charge someone with the death of Defendant's brother was made by the District Attorney's Office. Defendant replied "Don't make sense to me; I ain't start shit." Detective Kryder asked Defendant to tell him and Captain Siget what happened at the time of the shooting, to which Defendant responded "you'll know what happened soon when court starts. I got a lawyer, he waiting . . . he probably knows I'm already here." After some discussion about who Defendant's lawyer was,[17] Detective Kryder again asked if Defendant wanted to tell his side of the story. Defendant stated "I'll wait and see what they tell me to say," referring to his attorney. Captain Siget then commented that it was fine if Defendant didn't want to tell his side of the story and that it was up to Defendant to decide whether to tell his side of the story to them. While not all of what Defendant says at this point in the interview is distinguishable from the audio of the videotape, Defendant at one point responded by stating "I ain't got a side." Defendant also said that if the police had the full video of the shooting then that would be good for him. Detective Kryder asked "what led you up to

---

[17] During custodial interrogation, Defendant acknowledged that he was represented by Jennifer Popovich.

25

start shooting?" Defendant responded "listen, when I talk to my lawyer, he come in, we can try again." Immediately after Defendant made that statement Detective Kryder and Captain Siget concluded the interview, as it had become clear that Defendant was not going to make a statement and had exercised his right to counsel and his right to remain silent.[18]

In the case of Commonwealth v. Rivera, 296 A.3d 1141, 1142 (Pa. 2023), Pennsylvania Supreme Court, in an opinion authored by Justice Brobson and joined by Chief Justice Todd and Justices Donohue, Dougherty, and Wecht,[19] "accepted review to reiterate that different harmless error standards apply when evaluating testimonial references to a defendant's post-arrest versus pre-arrest silence." Rivera, 296 A.3d at 1142. In that case, the Commonwealth charged defendant Rivera with rape of a child and related crimes. After securing an arrest warrant, the charging police trooper went to Rivera's house, appraised him of the charges against him, read him his Miranda warnings, and placed him under arrest. Id. at 1142. After his arrest, Rivera did not deny the charges against him and instead exercised his constitutional right to remain silent. Id. (citing U.S. Const. amend. V; Pa. Const. art. 1, § 9). At Rivera's trial, defense counsel questioned the charging trooper on cross-examination about the absence of physical evidence which was indicated by the findings in the physical examination reports of the victims. Id. at 1144. On redirect, the prosecutor asked the charging trooper four questions about Rivera's post-arrest, post-*Mirandized* silence. Id. Specifically, the prosecutor asked whether Rivera had ever

---

[18] The Court notes that at trial, Defendant testified during cross-examination that when he was being transported to Beaver County Courthouse for the interview with Detectives Siget and Kryder, Defendant told Detective Kryder that he did not want to talk to them. Defendant instead asked Detective Kryder to take him straight to Beaver County Jail because he did not want to talk to the police.

[19] Justice Wecht filed a concurring opinion "to suggest how prosecutors can better avoid introducing prejudice into trials that implicate [the law on post-arrest silence]." Rivera, 296 A.3d at 1163 (Wecht, J., concurring). See also, id. at 1170-71. Justice Mundy filed a concurring and dissenting opinion, in which she agreed with the majority's conclusion that the prosecutor's line of questioning infringed on the defendant's post-arrest right to remain silent and that the error was not harmless. Id. at 1171 (Mundy, J., concurring and dissenting). However, Justice Mundy found that the issue was not properly preserved for review, because defense counsel did not object with sufficient specificity when the improper testimony about the defendant's post-arrest silence was introduced, an issue that is not addressed by the Majority Opinion. Id. at 1172.

26

denied the charges against him, and whether Rivera had ever claimed to law enforcement that he didn't sexually abuse the victims. Id. Defense counsel objected to the line of questioning because "[a] person doesn't have to deny." Id. After this testimony, the trial court told the jury: "Okay, and just to defense counsel's point, that is his right as a defendant, okay, constitutional right." Id. at 1144-45 (brackets omitted). Notably, after the prosecutor asked these four questions about Rivera's post-arrest, post-*Miranda* silence, defense counsel did not request a sidebar, a curative instruction, or a mistrial. Id. at 1145. Later, in his case-in-chief, Rivera took the stand in his own defense. Id. He denied the allegations against him, offered a partial alibi defense for some of the accusations, and attacked the credibility of the victims' mothers. Id. The prosecutor did not comment on Rivera's post-arrest, post-*Miranda* silence during his closing argument. Id. Following deliberation, the jury returned a split verdict, finding Rivera not guilty of the most serious charges (one count of aggravated assault, four counts of rape of a child, and four counts of involuntary deviate sexual intercourse with a child) while finding Rivera guilty of the eleven remaining counts (including attempted aggravated indecent assault, endangering welfare of children, corruption of minors, simple assault, indecent assault, and indecent exposure). Id. at 1143, n. 2, 1145.

On appeal, Rivera argued that the reference to his post-arrest silence entitled him to a new trial. Id. The Superior Court held that the disputed testimony on Rivera's post-arrest silence was admitted in error. Id. See, Commonwealth v. Rivera, 255 A.3d 497 (Pa. Super. 2021). However, the Superior Court held that the error was harmless, arguing that the prejudice to Rivera was de minimis or nonexistent. Rivera, 297 A.3d at 1146.

In its opinion, the Pennsylvania Supreme Court expressed strong disapproval of the Superior Court's reliance on cases about *pre*-arrest silence in a *post*-arrest silence context, noting

27

that "there is a sharp line' bisecting harmless error review of testimonial references to pre- and post-arrest silence." Rivera, 296 A.3d at 1150-52 (discussing Commonwealth v. Adams, 628 Pa. 600, 104 A.3d 511 (2014) (plurality); Commonwealth v. Molina, 628 Pa. 465, 104 A.3d 430 (2014) (plurality); Commonwealth v. DiNicola, 581 Pa. 550, 866 A.2d 329, 337-38 (2005)). As the Rivera court noted, while Article I, Section 9 of the Pennsylvania Constitution "prohibits the use of **pre**-arrest silence as substantive evidence of guilt[,]" it allows the use of pre-arrest silence in certain circumstances "to 'impeach [a] testifying defendant with his prior statements, actions, or silence,' as well as for purposes of the 'fair response' doctrine." Id. at 1151 (emphasis added). At the conclusion of its review on pre-arrest silence caselaw, the Rivera court observed that the Pennsylvania Supreme Court "has struggled to create a uniform rule to govern references to pre-arrest silence (as have many other courts)." Id. at 1152. Regardless, because these rules govern pre-arrest silence, and the reference made in Rivera's trial was to post-arrest silence, the Supreme Court concluded that the Superior Court erred by relying on pre-arrest silence decisions to decide a post-arrest silence case:

> Undeniably, the four questions the prosecutor asked here related to Rivera's post-arrest, post-*Miranda* silence. The inquiry was not a one-off, unfocused, slip-of-the-tongue affair; the prosecutor hammered the point four times in four ways. If there was any doubt that these questions focused on the post-arrest period, the prosecutor removed such doubt at the outset of re-direct. Thus, the parties agree, and we with them, that the inaugural error below was the use of pre-arrest silence cases like *Adams* to judge a post-silence case like the one at bar.

Id. at 1149 (footnotes omitted).[20]

After concluding that the Superior Court erred by deciding a post-arrest silence case based on pre-arrest silence caselaw, the Supreme Court next reviewed the caselaw on post-arrest

---

[20] See also, id. at 1152 (footnotes omitted) ("This Court, it seems, has struggled to create a uniform rule to govern references to pre-arrest silence (as have many other courts). We need not square the circle here. We discuss *Adams*, *Molina*, and *DiNicola* only to show all three unmistakably involved facts relating to pre-arrest silence and to say the Superior Court erred in bringing this batch of cases to bear here. As the prosecutor in *Molina* aptly put it, there is a 'sharp line' bisecting harmless error review of testimonial references to pre- and post-arrest silence.").

silence, including the cases of Commonwealth v. Haideman, 449 Pa. 367, 296 A.2d 765 (1972),

Commonwealth v. Greco, 465 Pa. 400, 350 A.2d 826 (1976), Commonwealth v. Singletary, 478

Pa. 610, 387 A.2d 656 (1978), Commonwealth v. Turner, 499 Pa. 579, 454 A.2d 537 (1982), and

Commonwealth v. Mitchell, 576 Pa. 258, 839 A.2d 202 (2003). Rivera, 296 A.3d at 1153-1157.

Contrary to the law on pre-arrest silence, the Rivera court stated that references to post-arrest

silence are governed by a more uniform rule:

> For more than half a century . . . this Court has repeatedly signaled to the Commonwealth that referencing a defendant's post-arrest silence may imperil an entire case. **In fact, as Rivera correctly notes, we have often deemed a single such reference—answered or not, curative instruction or not—offensive enough to the constitution and the principles it embodies as to call for a new trial.**

Id. at 1153–54 (emphasis added).

After its lengthy review of the caselaw on use of a defendant's post-arrest silence, the

Pennsylvania Supreme Court in Rivera held:

> **All said, testimonial reference to a defendant's post-arrest silence is constitutionally off-limits; even a single reference, as reflected, risks reducing to rubble an entire prosecution.** Here, the four questions-and-answers about Rivera's post-arrest, post-*Miranda* silence violated this fundamental rule; as we have said before, they reduced his right to remain silent to a "hollow mockery," *Haideman*, 296 A.2d at 767, "implie[d] an admission of guilt," *Greco*, 350 A.2d at 828, and created an illusion that he "was in fact guilty." *Singletary*, 387 A.2d at 657. By telling the jury that he "stood mute or claimed his privilege" after his arrest, the Commonwealth ultimately caught him in that disallowed Catch-22— "[y]ou have the constitutional right to remain silent, but if you exercise it, that fact may be used against you." *Miranda*, 384 U.S. at 468 n.37, 86 S.Ct. 1602; *Haideman*, 296 A.2d at 768 (citation omitted). In short, these references penalized Rivera for exercising his right to remain silent and were, therefore, a "constitutionally impermissible" infringement on that right. *Turner*, 454 A.2d at 540; *Haideman*, 296 A.2d at 766.

Rivera, 296 A.3d at 1157 (footnotes omitted) (emphasis added). The Supreme Court explained

that a strict proscription on use of post-arrest silence is necessary because "most jurors, most lay

people, probably suppose that a truly innocent man would deny the charges upon his arrest." Id.

at 1153. "Hearing a defendant did not so deny, but instead stayed silent, the logic goes, may lead the jury to conclude or infer the defendant must be guilty." Id.

The Rivera court also rejected the Commonwealth's argument that the testimony was admissible under the "fair response" doctrine or the related "theoretical *Doyle* exception" doctrine. Id. at 1157. Under the "fair response" doctrine, if a defendant raises a factual inconsistency at trial, for example, by asserting that he had given a statement to police when he in fact never made any statement to police, then the prosecutor may reference the defendant's silence as a "fair response" to the defendant's claim without violating his right to remain silent. See, Commonwealth v. Copenhefer, 553 Pa. 285, 303, 719 A.2d 242, 251 (1998). The Rivera court held the fair response doctrine was inapplicable that "questions about pre-arrest silence (such as those defense counsel asked on cross-examination) do not open the door for the Commonwealth to ask questions about post-arrest silence (which the prosecutor's questions on re-direct here clearly were)." Id. at 1158. The theoretical Doyle exception also deals with situations when a factual inconsistency arises between the defendant's testimony at trial and their silence at arrest. Turner, 454 A.2d at 539–40 (citing Doyle v. Ohio, 426 U.S. 610, 619 n. 11, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)). "Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent." Id. Because Rivera did not testify that he spoke to police after he was arrested when he in fact did not, the Supreme Court held that the prosecutor's questions "[could not] meet the (theoretical) *Doyle* exception." Id. (citing Doyle, 426 U.S. at 619 n.11, 96 S.Ct. 2240; Turner 454 A.2d at 539-40).

Having concluded that the prosecutor's questions violated Rivera's post-arrest right to remain silent, the Rivera court turned to the question of whether the error was harmless. The

30

court held that the error in admitting the post-arrest testimony was not harmless, and so Rivera was entitled to a new trial:

> In all, while the Commonwealth rightly notes the prosecutor did not bring the issue up at closings or otherwise, considering the constitutional right at stake; our case law; the repeated, intentional, and court-sanctioned nature of the inquiry; the centrality of credibility in this case; the extent to which these questions probably undermined Rivera's credibility; the lack of physical evidence; the absence of an adequate curative instruction and the split verdict, we reverse the judgment of the Superior Court in part and, as we did in *Haideman, Greco, Singletary*, and *Turner*, award Rivera a new trial.

Id. at 1161.

In what the Rivera court called its "seminal *Turner* decision," the Pennsylvania Supreme Court awarded the defendant a new trial, holding that the Commonwealth violated the defendant's post-arrest right to remain silent under Article I Section 9 of the Pennsylvania Constitution where the prosecutor asked the defendant during cross-examination whether he had ever told the police that he shot the alleged victim in self-defense. In Turner, there was conflicting evidence about whether "the gun was fired during the course of a struggle" or whether the defendant "stood over" the victim and shot him with intent. Turner, 454 A.2d at 538. Turner testified in his own defense and claimed that the shooting was in self-defense. Id. During cross-examination, Turner said that he saw the victim shooting at him, which prompted the prosecutor to ask if Turner had ever told the police that somebody was shooting at him. Id. Defense counsel objected to the question before the defendant answered and moved for a mistrial at a subsequent sidebar. Id. The trial court denied the motion and instead provided a lengthy curative instruction to the jury. Id. Ultimately, the jury rendered a split verdict acquitting Turner of murder but finding him guilty of manslaughter. Id.

On appeal, the Pennsylvania Supreme Court awarded Turner a new trial, as it had done in Haideman, Greco, and Singletary. Finding that the prosecutor's questions impermissibly

31

referenced Turner's post-arrest silence, the <u>Turner</u> court concluded that "the privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury," and the court reiterated that "[t]he prejudice to the defendant resulting from reference to his silence is substantial." <u>Id.</u> at 539 (quoting <u>Haideman</u>, 296 A.2d at 767). The <u>Turner</u> court then declined to find the error harmless, stressing in particular the jury's split verdict:

> In order to draw conclusions from the verdict about what the jury believed, the Commonwealth's hypothesis about the jury's state of mind would have to be a necessary and sufficient explanation of the verdict. But the most obvious of alternative explanations presents itself: the jury may have delivered a compromise verdict. The jury may have decided that the Commonwealth's case was significantly bolstered by the reference to [the defendant's] post-arrest silence and that it would be appropriate to impose a verdict more severe than acquittal but less severe than murder. Verdicts are arrived at after many objective and subjective considerations and do not always conform perfectly to the instructions given by the court. Thus, no sound conclusions can be drawn from the verdict about what the jury believed concerning [the defendant's] credibility. To attempt to draw such conclusions is to speculate. As we cannot be sure that the jury would have resolved the issue in the same manner absent the improper reference, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict. Far from being harmless error, the reference may well have impermissibly contributed to the verdict.

<u>Id.</u> (citation and internal quotation marks omitted). <u>See also</u>, <u>Commonwealth v. Mitchell</u>, 576 Pa. 258, 277–78, 839 A.2d 202, 213 (2003) ("Following <u>*Turner*</u>, this court has been consistent in prohibiting the post-arrest silence of an accused to be used to his detriment.") (citing <u>Commonwealth v. Costa</u>, 560 Pa. 95, 742 A.2d 1076 (1999); <u>Commonwealth v. DiPietro</u>, 538 Pa. 382, 648 A.2d 777 (1994); <u>Commonwealth v. Clark</u>, 533 Pa. 579, 626 A.2d 154, 156 (1993)).

The <u>Turner</u> court also explained what the <u>Rivera</u> court called the "theoretical *Doyle* exception." <u>Rivera</u>, 296 A.3d at 1157. The <u>Turner</u> court held that, while it may prove difficult for the Commonwealth to "uncover a fabricated version of events" from the defendant to later impeach him at trial, the Commonwealth "must seek to impeach a defendant's relation of events

32

by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial." Id. (quoting Doyle, 426 U.S. at 617, 96 S.Ct. 2240). Theoretically, the court noted, post-arrest silence could be used if the defendant testifies at trial that he spoke to police when he did not, but otherwise, a defendant may not be penalized "for exercising the right to remain silent." Id. at 540. For example, "[s]ilence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent." Id. (citing Doyle, 426 U.S. at 618, 96 S. Ct. at 2245). "Absent such an assertion, the reference by the prosecutor to previous silence is impermissible and reversible error." Id. In his concurrence to Rivera, Justice Wecht explained that, "[i]n other words, in Pennsylvania, a prosecutor may only impeach a testifying defendant if that defendant alleges that his in-trial testimony is consistent with what he told the police earlier." Rivera, 296 A.3d at 1167 (Wecht, J., concurring). If, in fact, the defendant never spoke to the police, and never provided the police the version of events he conveyed to the jury during trial, then the prosecutor may reveal to the jury through cross-examination that the defendant had maintained his silence prior to trial. Id.

Here, Rivera, Turner, and related caselaw from the Pennsylvania Supreme Court illustrate that the testimony offered and comments made about Defendant's post-arrest, post-Miranda silence in this case were constitutionally impermissible. A.D.A. Battin asked two witnesses, Detective Kryder and Detective Captain Siget, who were also the affiants in this case, whether Defendant had told them that he acted in self-defense during the interview at the Beaver County Courthouse, which occurred after Defendant's arrest and after he had received his Miranda warnings. (See, Cmwlth's Ex. 59). A.D.A. Battin specifically asked Detective Kryder "when

33

you did this interview for Mr. Warren **or at any time** did Mr. Warren ever say he shot in self defense?" N.T., Trial Vol. V, 2/7/2024, at 87. This question clearly encapsulates the time periods both before and after Defendant's arrest. Further, the Commonwealth recalled Detective Kryder specifically to introduce the video of the custodial interrogation, and to ask about whether Defendant stated that he acted in self-defense during that interview. Detective Captain Siget testified immediately after the Commonwealth recalled Detective Kryder. Within the course of one day of trial, the jury heard both of the law enforcement affiants on this case testify that Defendant had not raised a self-defense claim during custodial interrogation after he was arrested. The repeated testimonial references to Defendant's post-arrest silence reemphasized for the jury that Defendant could have, but did not, inform law enforcement of his self-defense claim.[21]

In addition, review of the video of the interview Detective Kryder and Captain Siget were asked about shows that Defendant informed Detective Kryder and Captain Siget that he would tell them what his side of the story was at trial, and that he had an attorney. Id. The Commonwealth played only part of this video for the jury so that the jury would not see or hear the portions of the video when Defendant informed the detectives that he had an attorney and later when he invoked his right to counsel at the conclusion of the interview. Id. Because A.D.A. Battin knew that Defendant had invoked his right to remain silent and his right to counsel during the exact interview that he asked the detectives about, he "implie[d] an admission of guilt" from Defendant and created an illusion that he "was in fact guilty." Rivera, 296 A.3d at 1157 (citing Greco, 350 A.2d at 828; Singletary, 387 A.2d at 657).

---

[21] While defense counsel did not object to the testimonial references made to Defendant's post-arrest silence, he did promptly object to the references made to Defendant's post-arrest silence during closing argument. Given that "[w]hen a prosecutor exploits an accused's post-arrest silence during closing argument, the prejudice is compounded[,]", the Court finds that this issue is properly preserved for appellate purposes. Commonwealth v. DiPietro, 538 Pa. 382, 389, 648 A.2d 777, 781 (1994).

The issue created by asking those questions about Defendant's post-arrest silence was compounded by the reference to that testimony during the Commonwealth's closing argument. Commonwealth v. DiPietro, 538 Pa. 382, 389, 648 A.2d 777, 781 (1994) ("When a prosecutor exploits an accused's post-arrest silence during closing argument, the prejudice is compounded."). During closing argument, A.D.A. Battin commented that Defendant

> waited two plus years, as he was hiding in Michigan, to tell you the story . . . you heard last week. He had the opportunity to hear all the evidence and then tell you his side of the story, **a story that he would not give Kryder or Siget**. In fact, they specifically asked him multiple times, "What's your side?" His response, "I ain't got a side."

N.T., Trial Vol. VIII, 2/12/2024, at 82 (emphasis added). The remark that Defendant waited "two plus years" to tell his side of the story more closely resembles a reference to Defendant's pre-arrest silence than his post-arrest silence, and is permissible under the caselaw. However, the comment that Defendant's self-defense claim was "a story that he would not give Kryder or Siget" specifically reminded the jury about the testimony that they had heard from those detectives earlier in trial that, during custodial interrogation that, unbeknownst to the jury, ultimately concluded when Defendant invoked his right to remain silent and his right to counsel, Defendant had not informed them that he shot the alleged victims in self-defense. Since the jury was not permitted to know that Defendant had invoked his constitutional rights to counsel and to remain silent during the interview, the Commonwealth's reference to his post-arrest silence during the very same interview painted a prejudicial picture for the jurors that because Defendant did not tell Detective Kryder and Captain Siget that he acted in self-defense, the self-defense claim he presented at trial was likely fabricated. Thus, the testimony from the detectives and the comments made during closing argument impermissibly addressed Defendant's post-arrest silence in violation of his constitutional rights as explained by the Pennsylvania Supreme Court in Rivera and related decisions.

35

Furthermore, the questions asked in this case are also similar to the improper questions asked in Turner. In that case, the prosecutor asked the defendant "Did you ever tell the police that somebody was shooting at you?" Turner, 454 A.2d at 538. Here, A.D.A. Battin asked Detective Kryder and Detective Captain Siget if Defendant had told them that he acted in self-defense after he was arrested. In both this case and in Turner, the effect of the question was to undermine the defendant's self-defense argument by insinuating to the jury that the self-defense claim was fabricated before trial. In fact, during closing argument, A.D.A. Battin remarked: "So what do you say when we got your DNA, you can't dispute that you did it, we have you on video doing it, so what is the only defense available to you at that point, self defense." N.T., Trial Vol. VIII, 2/12/2024, at 78. This, along with other similar comments made during closing argument, show that the effect of bringing out Defendant's post-arrest silence was to insinuate that his claim of self-defense was fabricated.[22] Therefore, the comments made here rose to the level of impropriety found in Rivera and Turner. See also, Commonwealth v. Johnson, 2001 PA Super 328, 788 A.2d 985, 991 (2001) ("[T]he caselaw makes clear that the Commonwealth is not permitted to point out a defendant's post-arrest failure to exculpate himself to impeach the defense offered at trial.").

Next, the fact that Defendant made certain statements to Detective Kryder and Captain Siget during the custodial interview does not make Rivera inapplicable or permit the Commonwealth to reference Defendant's post-arrest silence here, which was the Commonwealth's main argument at the hearing on Defendant's oral motion for extraordinary

---

[22] While a prosecutor may argue that a defendant fabricated their trial testimony after viewing all of the evidence against them, the prosecutor cannot use a defendant's post-arrest silence to support such an argument. See, Commonwealth v. Nolen, 535 Pa. 77, 634 A.2d 192 (1993) (prosecutor's cross-examination meant to show that the defendant had the opportunity to hear all the witnesses at the first trial and other proceedings and thus could shape his testimony to the Commonwealth's evidence did not violate his post-arrest right to remain silent because there was no actual reference made to the defendant's post-arrest silence).

relief. At the extraordinary relief hearing, defense counsel cited the case of Commonwealth v. DiPietro, 538 Pa. 382, 648 A.2d 777, (1994), in which the Pennsylvania Supreme Court held:

> **It is irrelevant whether a defendant elects to assert the constitutional right to remain silent from the outset or makes a voluntary statement and then asserts the right.** *Commonwealth v. Dulaney*, 449 Pa. 45, 295 A.2d 328 (1972); *Commonwealth v. Williams*, 252 Pa.Super. 435, 381 A.2d 1285 (1978). *See also Commonwealth v. Mitchell*, 246 Pa.Super. 132, 137, 369 A.2d 846, 848 (1977) ("the right not to have one's silence used against one does not depend upon whether the right is asserted at the beginning of interrogation or later on"). "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). A prosecutor may not make any references to a "defendant's resumption of silence." *Commonwealth v. Greco*, 227 Pa.Super. 19, 23 n. 4, 323 A.2d 132, 134 n. 4 (1974), *aff'd*, 465 Pa. 400, 350 A.2d 826 (1976). *See also Commonwealth v. Hinds*, 244 Pa.Super. 182, 191, 366 A.2d 1252, 1257 (1976) ( "testimonial reference to an accused's assertion of his rights, whether made at the time of his arrest or at some later time, is prejudicial and requires that a new trial be granted").

Commonwealth v. DiPietro, 538 Pa. 382, 386, 648 A.2d 777, 779 (1994) (emphasis added) (quoted with approval in Commonwealth v. Duffey, 573 Pa. 186, 203, 855 A.2d 764, 774 (2004)).

In DiPietro, the Pennsylvania Supreme Court granted the defendant a new trial based on Greco, Turner, and related decisions. Id. at 385, 388, 392. The defendant in that case was convicted of aggravated assault and recklessly endangering another person for driving his vehicle over a curb and striking the victim in an allegedly purposeful manner. Id. at 383–84. At trial, the prosecutor improperly referenced the defendant's post-arrest silence on two occasions. Id. at 384. First, during direct examination of the responding state trooper, the prosecutor asked "During the course of that conversation, Trooper Harriman, did [the defendant] tell you that this incident was an accident?" Id. Trooper Harriman replied, "No." Id. at 385. During closing argument, the prosecutor made the following remarks:

37

> [W]hy doesn't he tell that man, Trooper Harriman, My golly, good grief, what did I do? It was a terrible, terrible accident. I've been having this car problem. The brakes are bad. It kept stalling.
>
> When do we hear that? We hear that today from the witness stand. We didn't hear that from any of the police officers. Doesn't common sense simply tell you that if you're in that kind of situation, that would be the first thing out of your mouth?
>
> [Objection]
>
> I would suggest that that would be the first thing out of a man's mouth when he's talking to this officer about this specific incident.

Id. at 384–85. The DiPietro court concluded that the "testimonial reference to [the defendant's] post-arrest silence, the absence of an adequate cautionary instruction, and the further exploitation of Appellant's post-arrest silence during closing argument constitute[d] reversible error and mandate[d] a new trial." Id. at 392.

At oral argument for Defendant's extraordinary relief motion, the Commonwealth argued that Rivera and DiPietro did not apply to this case. Instead, the Commonwealth relied on the case of Commonwealth v. Jermyn, 516 Pa. 460, 533 A.2d 74 (1987). In that case, the Pennsylvania Supreme Court held that the "basis for the exclusion from evidence of a defendant's *silence* in the face of an accusatory statement by the police is the injustice of penalizing the exercise of the privilege against self-incrimination[,]" but that this "principle does not extend to instances in which the defendant does not remain silent but instead volunteers equivocal responses to police questioning." Id. at 475 (citing Commonwealth v. Jefferson, 430 Pa. 532, 243 A.2d 412 (1968); Commonwealth v. Dravecz, 424 Pa. 582, 227 A.2d 904 (1967). The Jermyn court concluded that because the defendant did not exercise his right to remain silent, but instead responded to the police officer's accusations in an equivocal fashion, the defendant's right to remain silent was not implicated, and the evasiveness of his answers to police questions was admissible for the jury's consideration. Id. at 475–76, 533 A.2d at 81.

While the Jermyn court does not specify whether its holding applies to pre- or post-arrest silence, it appears to the Court that Jermyn is applicable in *pre*-arrest silence cases, not *post*-arrest silence cases. The testimony at issue in Jermyn implies that the reference made to the defendant's silence was to his pre-arrest silence, not his post-arrest silence. The prosecutor asked the charging officer "did you ever confront [the defendant], sir, with the fact that you believed he was in fact the primary suspect in this case?" Id. at 474. The officer testified that, at the end of his interaction with the defendant, the defendant stated "Well, if you feel froggy go ahead and arrest me." Id. These comments seem to imply that these references were to the defendant's silence before he was arrested, since he challenged the police officer to arrest him if he felt "froggy." Id. In addition, most of the subsequent cases that cite Jermyn on this issue are pre-arrest silence cases. See, e.g., Commonwealth v. Hawkins, 549 Pa. 352, 385, 701 A.2d 492, 508–09 (1997) (citing Jermyn, 516 Pa. at 474–75, 533 A.2d at 80–81) (holding that because defendant waived his right to remain silent and made a response to police questions during pre-arrest interview, "that response, and the circumstances surrounding the response, were properly made available for the jury's consideration in evaluating the credibility of the verbal denial based on a contemporaneous non-verbal act."); Commonwealth v. Derhammer, No. 935 MDA 2013, 2014 WL 10962305, at *11 (Pa. Super. Ct. Apr. 29, 2014) (citing Jermyn, 533 A.2d at 81) (affirming on basis of trial court's Pa. R.A.P. 1925(a) Opinion, in which the trial court held that, while the Commonwealth was "certainly free to reference the interaction and exchanges Mr. Derhammer had throughout his transportation and interview process," it was prohibited from representing that "Mr. Derhammer failed to inquire about the welfare of the alleged victims" and from offering this failure as substantive evidence of the defendant's guilt); Commonwealth v. Rebert, No. 1021 WDA 2012, 2014 WL 10920320, at *7 (Pa. Super. Ct. May 13, 2014) (citing

Jermyn, 516 Pa. at 476, 533 A.2d at 81) (holding that the Commonwealth did not use defendant's pre-arrest silence as evidence of guilt; it was referencing the evasiveness of appellant's odd behavior and voluntary statements to police as evidence of consciousness of guilt). Accord, Commonwealth v. Baez, 554 Pa. 66, 107, 720 A.2d 711, 731 (1998) (citing Jermyn, 516 Pa. at 475, 533 A.2d at 81) (emphasis original) (holding that prosecutor was commenting "not on appellant's post-arrest silence, but on his post-arrest *statements*" when prosecutor referenced appellant's statement "I'm keeping it to myself" and implied that certain conclusions could not be drawn from that statement).

Because of Rivera's recency, our appellate courts have not yet had the opportunity to examine Jermyn's continued validity in the post-arrest silence arena. However, in view of the fact that the Supreme Court took the appeal in Rivera to clarify that different legal standards apply to references to a defendant's pre-arrest versus references to his post-arrest silence, in combination with the Jermyn decision's failure to explicitly state whether its holding applies for uses of pre-arrest silence or post-arrest silence, this Court found that Rivera implicitly overruled Jermyn, at least as to its application to cases that involve references to a defendant's *post*-arrest silence. Therefore, the Court rejected the Commonwealth's argument that Jermyn applied to the case at bar.

In preparing this Rule 1925 Opinion, the undersigned has reviewed the cases citing Jermyn since the date of the Rivera decision. In that time, there have been two unpublished Superior Court cases that have cited Jermyn. After review, neither case changes the Court's analysis. First, in Commonwealth v. Jones, 317 A.3d 627 (Pa. Super. Ct. 2024) (unpublished disposition), the defendant testified at trial about unsolicited statements he made to the police after his arrest and during transport to the police station. Id. The defendant testified that he

40

"tried a few times to let them [*i.e.*, the police] know what had happened," that he had shot someone and sustained injuries, and that he was "not a bad guy." Id. On cross-examination, the Commonwealth asked for a sidebar and asked the trial court to rule on whether, by testifying about his statements to police, Jones had opened the door to cross-examination about factual inconsistencies between his trial testimony and his prior statements to the police. Id. The court ruled that the Commonwealth could ask Jones the questions, and that Jones could respond that the officers had told him not to make any statements. Id. On appeal, the Superior Court found the issue waived as Jones did not object to the trial court's ruling. Id. However, the court in dicta noted that even if the issue was not waived, the trial court did not abuse its discretion based on the "fair response" doctrine:

> Even if it were not waived, we would not find an abuse of discretion. The prohibition on questions seeking to expose a defendant's silence does not apply where the defendant did not remain silent. *Commonwealth v. Jermyn*, 533 A.2d 74, 81 (Pa. 1987). A defendant's post-arrest statements to the police are permissible for impeachment purposes if the defendant offers contrary testimony about the content of those statements. *See Commonwealth v. Turner*, 454 A.2d 537, 539-540 (Pa. 1982) ("Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related [his version of events] to the police at the time of arrest when in fact he remained silent"); *Commonwealth v. Copenhefer*, 719 A.2d 242, 251 (Pa. 1998) ("[W]here a prosecutor's reference to a defendant's silence is a fair response to a claim made by defendant or his counsel at trial, there is no violation of the Fifth Amendment privilege against self-incrimination").
>
> Here, the police did not question Jones. Jones nonetheless voluntarily made certain statements to the police and testified on direct examination that he had explained to the police what had happened during the alleged attack. The Commonwealth was therefore permitted to question him about the extent of the explanation he had volunteered and expose any inconsistencies between those statements and his trial testimony. The issue thus warrants no relief.

Id. In the other case, Alkozbari v. Wanaselja, 313 A.3d 209 (Pa. Super. Ct. 2024) (unpublished disposition), the Superior Court cited Jermyn for the rule that a trial court has discretion to limit an attorney's comments during closing argument. Id. (citing Jermyn, 533 A.2d at 80).

41

Jones does not apply to the case here because Defendant Warren did not testify about the statements he made to law enforcement during custodial interrogation. Therefore, the Commonwealth's references to Defendant's post-arrest silence were not in fair response to testimony from the Defendant. The Commonwealth's testimonial references to Defendant's post-arrest silence were actually made before Defendant had even testified here. Therefore, Jones does not change the Court's analysis of the Commonwealth's impermissible references to Defendant's post-arrest silence.

Furthermore, here, the effect of the questions asked of the two affiant-detectives in combination with the reference to their testimony during closing argument struck the Court not as comments on the evasiveness of Defendant's responses during custodial interrogation, but rather as improper references to Defendant's post-arrest silence. A.D.A. Battin's remark during closing argument that Defendant's self-defense claim was "a story that he would not give Kryder or Siget" directly addressed something that Defendant did not say during his interview with Detective Kryder and Captain Siget. N.T., Excerpt of Jury Trial, Closing Arguments, 2/12/2024, at 49. Under the caselaw, A.D.A. Battin was allowed to comment on what Defendant actually did say during custodial interrogation. For example, immediately after the remark quoted above A.D.A. Battin said "In fact, they specifically asked him multiple times, 'What's your side?' His response, 'I ain't got a side.'" Id. This statement was permissible since it commented only on what Defendant actually said during the police interview. However, the error occurred when A.D.A Battin referenced what Defendant did not say during that interview. The comment that Defendant's self-defense claim was "a story that he would not give Kryder or Siget" did not address the potential evasiveness of Defendant's responses during custodial interrogation. Instead, it only addressed Defendant's post-arrest silence. While the "evasiveness of such

42

answers can properly be considered by the factfinder and inferences drawn therefrom[,]" the strength of the language of the Rivera court's conclusion, that "even a single reference [to a defendant's post-arrest silence] risks reducing to rubble an entire prosecution," implies that the Commonwealth is restricted to commenting on the evasive answers actually given to police, and prohibited from commenting on what was not said to police. Jermyn, 516 Pa. at 476, 533 A.2d at 81; Rivera, 296 A.3d at 1157. In other words, here, the Commonwealth was free to comment on the evasiveness of Defendant's statements to police during custodial interrogation, however, it was not free to reference his silence, *i.e.*, what Defendant did not say during custodial interrogation. Thus, the testimony and comments concerning Defendant's post-arrest, post-*Miranda* silence were impermissible and violated Defendant's rights under the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, regardless of the fact that Defendant made certain statements to the police following his arrest.

Finally, the references to Defendant's post-arrest silence were not permissible under the "fair response" doctrine. Throughout trial, Defendant challenged the Commonwealth's investigation of this matter. However, the challenges raised concerning the Commonwealth's investigation dealt with the time prior to Defendant's arrest, while he was still in Michigan. The questions asked by defense counsel largely involved questions about why no one personally went to Defendant's Michigan address, why no one called Defendant by phone, and other related pre-arrest issues. Therefore, just as in Rivera, defense counsel's "questions about pre-arrest silence [did] not open the door for the Commonwealth to ask questions about post-arrest silence." Rivera, 296 A.3d at 1158 (parentheticals omitted). In addition, Defendant's testimony, which he gave after the Commonwealth had already elicited testimony from Detective Kryder and Captain Siget about his post-arrest silence, did not raise a factual inconsistency that the Commonwealth

43

could resolve by commenting on Defendant's post-arrest silence. Further, immediately before the Commonwealth asked Detective Kryder whether Defendant had informed him of his self-defense claim on redirect examination, defense counsel emphasized on cross-examination that Defendant had said during the post-arrest interview that the video would be good for his case and that he didn't start the confrontation with the alleged victims. Defense counsel's comments on what Defendant *did* say during the post-arrest, post-*Miranda* interview did not permit the Commonwealth to comment on what Defendant *did not* say during the interview. Id. Therefore, the Commonwealth cannot justify the references to Defendant's post-arrest silence through the "fair response" doctrine.

Having concluded that the testimony and comments on Defendant's post-arrest silence were constitutionally impermissible, the next question is whether the error in presenting the testimony and comments was harmless. In Rivera, the Supreme Court applied the harmless error standard from Commonwealth v. Hairston, 624 Pa. 143, 84 A.3d 657, 671-72 (2014):

> Harmless error exists if (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

Rivera, 296 A.3d at 1146-47 (brackets and ellipsis omitted).

Based on this standard, the Court concludes that the error of admitting testimony about Defendant's post-arrest, post-*Miranda* silence was not harmless in this case. Thus, the caselaw constrained the Court to grant Defendant a new trial based on the admission of testimony about Defendant's post-arrest, post-*Miranda* silence, and the Commonwealth's reference to that testimony during closing argument. In their totality, the references made to the fact that Defendant did not inform Detective Kryder and Captain Siget of his self-defense claim at the

44

interview may have led the jury in this case "to conclude or infer [that] the defendant must be guilty." Rivera, 296 A.3d at 1153. The fact that the Commonwealth referenced Defendant's post-arrest silence twice during its case-in-chief and once during closing argument increased the potential that the jury was prejudiced against Defendant based on those references. "When a prosecutor exploits an accused's post-arrest silence during closing argument, the prejudice is compounded." DiPietro, 648 A.2d at 781. In fact, here, as in the seminal Turner case, the jury returned a split verdict which may have resulted from the repeated references to Defendant's post-arrest silence as well. Turner, 454 A.2d at 538. The jury in this case acquitted Defendant of criminal homicide, three counts of attempted homicide, and the aggravated assault of Tristen Nesmith. However, the jury found Defendant guilty of the aggravated assaults of Daron and Dwelley Choice and of three counts of REAP for Daron Choice, Dwelley Choice, and Tristen Nesmith. This compromise verdict shows that there is a substantial likelihood that the jury was prejudiced against Defendant by the improper testimony and comments about Defendant's post-arrest silence. Turner, 454 A.2d at 538.

In addition, the testimony about Defendant's post-arrest silence was not harmless because the testimony was not "merely cumulative of other evidence introduced at trial" and because the "properly admitted and uncontradicted evidence of guilt" was not "so overwhelming," as to render "the prejudicial effect of the error ... insignificant." Rivera, 296 A.3d at 1160-1161 (internal quotation marks and citation omitted). At trial, it was undisputed that Defendant killed Dwayne Wells, the alleged homicide victim, by shooting him with a handgun. The main issue at trial was whether Defendant killed Wells though justified self-defense, an issue which largely turned on the conflicting testimony of Commonwealth and Defense witnesses. Based on the jury's split verdict acquitting Defendant of homicide and attempted homicide but finding him

45

guilty of aggravated assault and REAP, the "properly admitted and uncontradicted evidence of guilt" was not "so overwhelming," as to render "the prejudicial effect of the error ... insignificant." Id. If the evidence of guilt was overwhelming, the jury would not have acquitted Defendant of homicide. See also, Commonwealth v. Morris, 303 A.3d 785 (Pa. Super. Ct. 2023) (citing Rivera, 296 A.3d 1141) ("Where, as here, a case turns on the credibility of conflicting witnesses, erroneous admission of evidence cannot be held harmless based on the conclusion that the other evidence of guilt was overwhelming.").

For these reasons, the error here was not harmless, and the Court was constrained to grant Defendant's request for a new trial based on the Commonwealth's impermissible reference to Defendant's post-arrest silence.[23] Defendant's decision not to inform investigating detectives about his claim of self-defense was within his constitutional rights, and the Commonwealth may not use his post-arrest silence to disprove his self-defense claim. As the Superior Court has stated:

> To refuse to present his defense to the police was not only a constitutional right of the accused, but indeed probably an advisable course to take. For the Commonwealth to use this fair assertion of a constitutional right as an admission of guilt was to fly in the face of the Fifth Amendment and the judicial decisions in execution thereof.

Commonwealth v. Johnson, 2001 PA Super 328, ¶ 10, 788 A.2d 985, 989 (2001) (quoting Commonwealth v. Dulaney, 449 Pa. 45, 295 A.2d, 328, 331 (1972)).

Therefore, for the reasons stated above, the Commonwealth's use of Defendant's post-arrest silence during trial constrains this Court to grant Defendant a new trial.

---

[23] In his concurrence to Rivera, Justice Wecht noted that "it is far worse to conclude incorrectly that the error was harmless than it is to conclude incorrectly that the error was reversible." Rivera, 296 A.3d at 1163 (Wecht, J., concurring) (quoting Commonwealth v. Molina, 628 Pa. 465, 104 A.3d 430, 455 (2014) (plurality)).

46

# V. CONCLUSION

For the reasons stated above, the Court humbly asks the Superior Court to affirm its decision to grant Defendant a new trial based on the Commonwealth's repeated references to his post-arrest, post-<u>Miranda</u> silence during its case-in-chief and its closing argument.

BY THE COURT:

_____ J.

TESLA
JUDGE

2024 AUG 16 P 1:42

BY THE COURT

JUDY R. ENSLEN
CLERK OF COURTS
2024 AUG 16 P 1:50
BEAVER COUNTY, PA.

47

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-637-2023
: NO. 783 WDA 2024
V. :
:
DECARLOS KAVAUN WARREN, :
:
DEFENDANT :

**TESLA, J.**                                    August **16**, 2024

## <u>RULE 1925 ORDER</u>

**AND NOW**, this **16** day of August, 2024, the defendant having filed a Notice of Appeal in the above-captioned case, the Court concludes that the accompanying Opinion satisfies the requirements of Pa. R.A.P. 1925(a). It is **ORDERED** that the Clerk of the Criminal Court Division of the Court of Common Pleas of Beaver County transmit the record in the above-captioned case to the Superior Court as soon as possible.

**BY THE COURT:**

_____

48